914 A.2d 212

**Scott A. WHITTINGTON**

v.

**Christina WHITTINGTON.**

**No. 32, Sept.Term, 2006.**

Court of Special Appeals of Maryland.

Jan. 4, 2007.

318

Stephen R. Robinson (Daniel A. Farlow, on brief), Towson, for appellant.

Christina M. Whittington, Deerfield Beach, pro se.

Panel MURPHY, C.J., SALMON, EYLER, and DEBORAH S., JJ.

EYLER, J.

In the divorce action between Scott Whittington ("Scott"), the appellant, and Christina Whittington ("Christina"), the appellee, the Circuit Court for Anne Arundel County granted the parties a divorce and granted Christina indefinite alimony, counsel fees, a monetary award, and an interest in the marital portion of Scott's two pensions. The court also ordered Scott to maintain a survivor benefit for Christina on one of his

pensions, granted her an interest in the survivor benefit, and ordered the division of certain jointly held marital property.

Scott noted an appeal, presenting six questions,[1] with numerous sub-parts, for review. We have rephrased them as follows:

I. Did the trial court err or abuse its discretion in granting Christina indefinite alimony of $1,500 a month?

II. Did the trial court err or abuse its discretion in valuing certain marital property and in equitably distributing the marital property?

III. Did the trial court err in awarding Christina a portion of the survivor benefit of Scott's Toyota pension?

IV. Did the circuit court make inconsistent findings of material fact warranting a reversal?

V. Did the circuit court err by failing to reconsider the alimony and counsel fee awards after amending the

---

1. Scott framed the issues as follows:
"I. The Circuit Court erred or abused its discretion in awarding $1500 per month indefinite alimony to Wife.
A. The trial court erred in awarding indefinite alimony when it did not make the finding of fact that even after Wife will have made as much progress toward self-support as can be reasonably expected, the standards of living of the parties will be unconscionably disparate.
B. The trial court erred in failing to consider the financial support Wife provides to her paramour and that which he provides to her.
C. The trial court abused its discretion in the amount of alimony awarded.
II. The trial court erred in its monetary award to Wife.
A. The trial court erred in determining which property is marital property and the value of the marital property.
B. By arbitrarily applying the factors of Family Law Article, Section 8–205(b)(2), the trial court erred in the amount of the monetary award.
III. The Circuit Court erred in awarding to Wife the survivor benefit of Husband's pension.
IV. The trial court made inconsistent findings of material facts requiring reversal.
V. The trial court erred in not modifying alimony and counsel fees award after it modified the monetary award.
V. The trial court abused its discretion in awarding counsel fees to Wife."

judgment to grant Christina an award of a portion of the Toyota pension survivor benefit?

VI. Did the circuit court err in awarding counsel fees without making any factual findings as to the reasonableness of the fees?

For the following reasons, we shall affirm the circuit court's judgment of divorce but otherwise vacate the judgment and remand the case for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

The parties were married on July 17, 1982, when Scott was 21 years old and Christina was 23. By then, they had been living together for three years; Scott had graduated from high school and had earned his Associates Degree in information systems from Anne Arundel Community College; and Christina, who also was a high school graduate, had become certified in typing and stenography by Fleet Business School.

In 1985, the parties purchased a home in the Annapolis area. They lived there until they separated on December 26, 2003.

By mutual agreement, the parties decided not to have any children, and none were born of the marriage.

For the first five years of their marriage, Scott worked for the State of Maryland, in the information systems field. In 1987, he was employed by Toyota, also in the area of information systems. He has worked for Toyota ever since.

For most of the marriage, Christina worked full-time as a typesetter and production artist in the graphic arts industry. In 1999, she decided to cut her hours to about 30–35 per week, due to job stress, "excessive overtime," and wrist and elbow problems. She began to work "flex time," meaning that, as long as she put in the requisite number of hours per week, she could work non-traditional hours, work from home, and work on weekends. In late 2003, after the parties separated, Christina's employer, Pro Graphics, asked her to work tradi-

tional hours.[2] She complained that she could not do so, because a traditional schedule interfered with caring for her dog. She was fired in June 2004 for not changing her work schedule.

The parties accumulated significant retirement and non-retirement assets over the course of their marriage.[3] Their lifestyle was comfortable, but not extravagant.

By all accounts, the parties' marriage was satisfactory for the first seven years. In 1989, Scott's mother died, and he went into a depression. Christina had been in counseling for depression herself, and did not have the emotional reserve to deal with Scott's state of mind. The parties agree that this marked the beginning of serious problems that plagued their marriage until their eventual separation, 14 years later.

According to Scott, the parties ceased having sexual relations in 1990. By the next year, there was a major "rift" in their relationship. According to Christina, she and Scott last engaged in marital relations in 1996. Christina acknowledged that, in her mind, the marriage was over in 1995. By 2000, the couple did not sleep in the same bed. Even before then, they functioned on completely different schedules. Scott got up early and went to bed early, and Christina slept late and stayed up late.

Even though their married life had deteriorated, the parties continued to live together as friends. They went on two vacations a year with members of Christina's family, traveled some, shared their finances, and made investments. They participated in different hobbies, however, and interacted very little at home.

In April 2002, Christina went on a business trip to Florida, to make a presentation for a company that later became Taylor & Francis. At that meeting, she was introduced to

---

**2.** Christina testified that she had been working from 2 or 3 p.m. until 9 or 10 p.m. each day. Pro Graphics asked her to begin coming to work between 11 a.m. and noon and work until 6 p.m.

**3.** The identity and value of specific assets will be discussed *infra*.

James Miller ("James"), a graphic designer for the company. They struck up a friendship that immediately became romantic and sexual. From then on, Christina traveled to Florida regularly to spend time with James.

About a year and a half later, in late 2003, Scott became romantically involved with Lisa Riseau ("Lisa"), who he had met through his hobby of dog agility training. Scott and Lisa became sexually involved in late November 2003.

Sometime in early December 2003, Scott and Christina had a frank conversation in which they revealed their romantic relationships with other people. They each expressed the desire to live with the person they were romantically involved with, and to end their marriage. Neither one was upset about the other's extramarital affair, because each recognized that their marriage had long before become one of convenience. They wished each other well in their new relationships.

On December 26, 2003, Scott moved out of the marital home and into Lisa's house. Christina remained living in the marital home for one year. She continued to travel to Florida frequently to see James. In December 2004, she moved to Florida, and she and James rented an apartment together.

From the time she was fired, in mid-2004, until the fall of 2005, Christina continued to do freelance work for Pro Graphics. Upon relocating to Florida in December of 2004, Christina began freelancing for Taylor & Francis as well. By the time of the divorce, she was working exclusively for Taylor & Francis on a freelance basis.

During the parties' separation, until the marital home was sold in April 2005, Christina and Scott each paid half of the mortgage and utility bills. Scott paid for maintenance on the home, lawn care, and the monthly home equity loan payments. Scott also continued to maintain Christina's health insurance and car lease through his employer. After moving to Florida, Christina continued to pay her share of the mortgage and utilities. She split costs associated with her new residence with James.

The sale of the marital home netted a profit of $203,385, which was deposited in an escrow account.

On January 28, 2005, in the Circuit Court for Anne Arundel County, Christina filed a complaint for absolute divorce on the ground of a voluntary separation of more than one year. She requested alimony, both *pendente lite* and indefinite, continued health insurance coverage through Scott's employer, a monetary award, and attorney's fees and litigation expenses, including expenses for *pendente lite* proceedings. Scott filed an answer admitting the ground for divorce, but denying that Christina was unable to support herself and needed alimony. Scott requested that the court deny all relief requested by Christina. The court denied Christina's *pendente lite* alimony and counsel fees request.

In June of 2005, Scott and Lisa purchased a house. Scott took a $40,000 loan from his Toyota 401(k) account to pay his share of the down payment. (By the time of trial, he had repaid all but $25,218 of that sum.)

The case went to trial on February 8, 2006. The parties introduced their Joint Statement of Marital Property pursuant to Rule 9–207, as a joint exhibit. Each party introduced numerous financial records.[4]

Scott and Christina testified and Christina's mother, Isabel Matiz, testified to corroborate the ground for divorce. The parties stipulated that, if called to testify, the vocational expert witness retained by Scott would opine that Christina

---

4. Counsel for Christina introduced fourteen exhibits, including Christina's most recent tax return, her amended financial statement, her bank records, a Social Security Statement detailing her income history, bills from the attorney who represented her at the *pendente lite* stage, a summary of Scott's compensation and benefits package from Toyota, and a summary of Scott's credit card spending from 2002 through 2006. Counsel for Scott introduced fourteen exhibits, including Christina's credit card statements, a check from James to Scott for Christina's share of the mortgage and utility bills, Christina's original financial statement, a statement from the management company for the apartment where Christina and James resided, a car insurance statement covering cars for Christina and James, and statements from retirement and non-retirement accounts.

had the present ability to earn $35,000 annually, in full-time employment. At the conclusion of testimony, counsel for the parties delivered closing arguments, and the court held the matter *sub curia.*

On February 22, 2006, the court issued a memorandum opinion and order granting Christina an absolute divorce and a monetary award of $30,531.60, and awarding her indefinite alimony of $1,500 per month and $7,500 in attorney's fees.

Within ten days, Christina filed a motion to alter or amend asking the court, among other things, to award her an interest in the survivor benefit of Scott's Toyota pension. Scott opposed the motion. After a hearing, the court granted Christina's motion and entered an amended judgment awarding her 40% of the survivor benefit of the Toyota pension, payable on an "if, as, and when" basis, pursuant to the *Bangs* formula.[5]

The amended judgment was entered on June 1, 2006. On June 14, 2004, Scott noted a timely appeal.

We shall recount additional facts as necessary to our discussion of the issues.

## DISCUSSION

### I.

#### *Alimony*

Scott contends the circuit court erred in awarding Christina indefinite alimony and that, assuming *arguendo* that indefinite alimony was appropriate to award, it erred in awarding the sum of $1,500 a month.

---

**5.** The *Bangs* formula takes its name from *Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984), in which this Court approved the use of a coverture formula to allocate pension benefits based on the length of the marriage and the length of employment by the pension holder.

## A. *Evidence about the Parties' Incomes and Finances.*

The evidence at trial showed that, in his last year as a State employee, Scott earned an annual salary of $35,000. His starting salary with Toyota, in 1987, was $42,000. Scott received many raises over his years with Toyota, and at the time of trial was earning an annual salary of $149,000.

Before and during the marriage, until 1989, Christina was employed by Whitmore Printing. When she left employment there, she was earning an annual salary of about $25,000. She went to work for Pro Graphics as a salaried employee. She continued to work at Pro Graphics full-time until 1999. During this period, her annual income increased from a starting salary of around $25,000 to a high of $38,000 in 1997. Her salary decreased slightly, to $37,000, for the years 1998 and 1999. After reducing her hours in 1999, Christina earned approximately $34,000 annually from 2000 through 2003.

In 2005, when she was freelancing exclusively for Taylor & Francis, Christina was earning an average of $2,400 per month ($28,800 a year).[6] She still was limiting her work to about 30 to 35 hours per week, and was working from home. She testified that that was a lifestyle choice on her part.

As discussed, *supra,* the parties stipulated that, if called to testify, Martin Kranitz, a vocational expert hired by Scott, would opine that Christina's potential income, if she were working full-time, was $35,000 a year. Christina's lawyer explained:

> [T]hat that figure, 35,000, is consistent with full-time work in [Christina's] profession, with her skill level, and the geographic region that she is in.
>
> She is not presently making 35, and we are not stipulating to her voluntary impoverishment or under-unemployment [sic]. But to avoid [the expense of the expert witness], we

---

**6.** Christina testified that, because she works on a freelance basis, her workload and corresponding earnings fluctuate dramatically from month to month.

agree that that number is at least consistent with the prior work history as well, Your Honor.

Christina testified that James owns Sebastian Design Works ("SDW"), a freelance graphic design company. She is the company's only employee. The money she is paid for her freelance work is deposited into SDW's bank account, over which she has no control. She is not authorized to write checks from that account.

James makes the payments for Christina's bills and expenses from the SDW account. Also, entertainment and other such expenses incurred by Christina are run through that account. James is an employee of Taylor & Francis, and receives health insurance coverage through his job. He deposits his pay into the SDW bank account as well. According to Christina, James earns approximately $6,000 more a year than she does.

Christina testified that she and James have been sharing all of their expenses from the time they began living together, in December 2004. *Pendente lite*, Christina had submitted a financial statement that reflected the total expenses she and James were sharing. She later submitted an amended financial statement that reflected only her 50% share of these expenses.

According to Christina, in the last years of their marriage, she and Scott lacked the "deep emotional connection" that is necessary in a "marriage type relationship." She acknowledged, on cross-examination, that she is in a sexual relationship with James, that she has a "deep emotional connection" to him, and that they share their finances and bills. She stated that her relationship with James is so close that she trusts him completely with her finances.

Christina made clear that she and James have no plans to get married, and she does not foresee herself ever remarrying.

When asked to describe the standard of living the parties established during their marriage, Christina testified:

It was very comfortable. We had a really nice life. We had a nice home. We had nice cars. We took really nice vacations. We were able to travel frequently. We went to a lot of sporting events. We had season tickets to almost every sport. We went to shows. We had a lot of disposable income.

She contrasted her standard of living during the marriage to her standard of living after the parties' separation:

During our marriage, in the years that we worked to try to achieve the freedom to do the things that we wanted to do, we worked hard to try to build ou[r] careers, and earn the money that would let us have the freedom to travel and to do things without worrying about paying bills. I can't do that now. I have to worry about, can I make this payment? I have to worry about, can I afford to have this expense? And I never had, you know, I haven't had that since probably I started out after leaving my parents' home.

Scott testified that, while married, the parties lived comfortably. Early on, when he began working for Toyota, he started planning for retirement by investing heavily. Christina was not very involved in this planning. He and Christina were satisfied with their modest home and never sought to purchase a larger home as their income increased. Twice a year they vacationed with members of Christina's family. They owned two time-shares, one in Ocean City and one in St. Maarten's, which they would use or trade so they could stay at other time-shares. Before trial, they had agreed that Scott would keep the Ocean City time-share and Christina would keep the St. Maarten's time-share.

When Scott was asked on cross-examination whether he thought it was fair for Christina to live a "$30,000–a–year lifestyle while [he] enjoy[ed] $150,000 of income," he replied: "Those were career choices we made."

Counsel had submitted memoranda of law prior to closing arguments. In his closing argument, Christina's lawyer referred to a chart attached to his memorandum (also attached to Christina's brief on appeal), listing reported cases of this

Court from 1983 to 2000, in which awards of indefinite alimony had been affirmed, and for each case, giving the income of each spouse upon divorce, the percentage of the lower income to the higher, and the length in years of the marriage. (For some of the cases, the age of the "economically dependent spouse" was listed also.) The income percentages ranged from 10% to 70%, and the years of marriage ranged from 4 years to 36 years.

Christina's lawyer argued, based on the chart, that the two most important factors with respect to whether there will be an "unconscionable disparity" in post-divorce standards of living are the length of the marriage and the income percentages, and, given that alimony was awarded in the list of cases provided, it would be an abuse of discretion or an error of law for the court in this case not to award indefinite alimony. Specifically, he argued that the marriage here was 23 years (from the mid–1982 until the trial date in February 2006) and that the parties' incomes were $150,000 and $35,000 (23.3%), making this an indefinite alimony case.

Scott's lawyer argued in closing that alimony should not be decided solely based upon income percentages and years of marriage. He pointed out, also, that the parties' stipulation, that an expert witness would have testified that if Christina was working full-time she would be earning $35,000 a year, was refuted by Christina herself, who testified that she was earning $30 per hour doing freelance work, and that, if she worked 30 hours per week at that rate, her earnings would be $46,000 per year.

In addition, Scott's counsel emphasized that Christina is now in a "marriage type relationship" with James, and argued that that should preclude an award of alimony:

[T]here is the emotional tie; there is the economic tie; there is the joint—the checking account where he has her money; there is the joint homeowners—auto insurance policy; there is the joint lease of the parties, of [James] and [Christina].... There is an investment of faith that marriages tend to have that is exhibited in this relationship.

In response, Christina's lawyer disputed that there was any basis in the law for denying alimony to an ex-spouse because, post-separation, he or she became involved in a "marriage type relationship." He maintained that, absent a separation agreement providing for termination of alimony based upon cohabitation, alimony would terminate only upon remarriage. He further stated:

> It is absurd to think that a party post-separation that pursues a relationship with another person-as [Christina] has done, combining assets and income—forgo[e]s all of their legal rights, including the right to alimony based upon the marriage.

### B. The Trial Court's Ruling

In his memorandum opinion, the trial judge explained as follows his decision to grant Christina indefinite alimony of $1,500 a month:

> [Christina] has requested an award of alimony and she believes it should be indefinite alimony.
>
> The Court looks to Family Law Article 11–106(b) for guidance:
>
> 1) The Court believes that [Christina] has the ability to become self-supporting. It was stipulated that she can earn $35,000.00 per year and this is consistent with Plaintiff's Exhibit 6 (earnings record). In 1996, 1997, 1998, and 1999, [Christina] earned over $35,000 per year and slightly under $35,000 from 2000 through 2003.
>
> 2) The time necessary for [Christina] to gain sufficient education or training to enable that party to find suitable employment does not appear to apply to this case. [Christina's] education is complete and she is 46 years of age. [ . . . ].
>
> 3) The parties had a very comfortable standard of living while together, enjoying vacations, sporting events, etc. Currently [Scott] is still enjoying that standard while [Christina] is not.
>
> 4) This was a lengthy marriage.

5) Both parties contributed to the economic and non-economic well being of the family.

6) There appears to be no fault in the breakdown of the marital relationship. The parties lived together out of convenience for at least the last 12 years of their marriage.

7) [Scott] is 46 and [Christina] is 44. The parties are still young enough to advance themselves beyond their current situation and continue on with their lives.

\* \* \* \* \* \*

9) [Scott's] income is more than adequate to allow him to meet his needs if he is ordered to pay alimony.

\* \* \* \* \* \*

11) The financial needs and resources of the parties has [sic] been considered. [Christina's] annual income is, or should be, $35,000.00 and [Scott's] annual income is $150,000 and has increased on a regular basis. Both parties share their current living expenses with their companions and both will receive a significant amount of money when the escrow funds are released. Neither party is significantly in debt.

\* \* \* \* \* \*

Once the Court applies the above factors and determines alimony is appropriate it needs to determine whether an award of alimony should be indefinite. The Court must find one of the following in order to make an indefinite award:

1) [Court recites first factor and finds it does not pertain to this case].

2) *Will the respective standards of living of the parties be unconscionably disparate? Clearly, since the separation, [Christina's] standard of living has been much lower than during the marriage. [Scott's] standard of living has remained the same or higher.*

*The Court finds that not only is alimony appropriate in this case, it finds that indefinite alimony is required.*

*The Court will order [Scott] to pay [Christina] the sum of $1,500.00 per month as indefinite alimony.*

(Emphasis supplied.)

### C. Parties' Contentions on Appeal

Scott complains that the trial court erred and abused its discretion in awarding indefinite alimony, and in awarding indefinite alimony in the amount it did. Specifically, he argues that the trial judge did not make a finding, as required by Maryland law, that the standards of living of the parties would be unconscionably disparate at a time, projected in the future, when Christina will have reached her earning potential; rather, the court simply pronounced that because, during the separation, Scott's standard of living had not changed but Christina's standard of living was "much lower" than it had been, indefinite alimony was "required." He also asserts that a circuit court is not empowered to award, or at least should not award, indefinite alimony when the party seeking alimony is living in a "marriage type relationship" with another, as Christina is. Finally, he argues that the amount of alimony awarded was not reasonably based upon Christina's needs and expenses.

Christina counters that the trial court considered all of the factors necessary to evaluate her alimony claim, that it did not make any erroneous findings of fact, that the court properly found an unconscionable disparity in the parties' standards of living, and that the fact that she is living in a "marriage type relationship" with James is irrelevant, and did not preclude an award of alimony.

### D. The Law of Alimony

The essential purpose of alimony was changed with the adoption of the Maryland Alimony Act in 1980 ("Act"). Where the principal function of alimony once had been maintenance of the recipient, dependent spouse's standard of living, upon passage of the Act, that function became rehabilitation of the economically dependent spouse.

*Karmand v. Karmand,* 145 Md.App. 317, 327, 802 A.2d 1106 (2002). For that reason, "the 'statutory scheme [governing] alimony generally favors fixed-term or so-called rehabilitative alimony,' rather than indefinite alimony." *Simonds v. Simonds,* 165 Md.App. 591, 605, 886 A.2d 158 (2005) (quoting *Tracey v. Tracey,* 328 Md. 380, 391, 614 A.2d 590 (1992)).

■ The preference for fixed-term alimony stems from "the conviction that 'the purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently.' " *Simonds, supra,* 165 Md.App. at 605, 886 A.2d 158 (quoting *Tracey, supra,* 328 Md. at 391, 614 A.2d 590). *See also Turrisi v. Sanzaro,* 308 Md. 515, 524–25, 520 A.2d 1080 (1987) (noting that fixed-term alimony "promote[s] the transitional or rehabilitative function" of the Act); *Jensen v. Jensen,* 103 Md.App. 678, 693, 654 A.2d 914 (1995) (stating that "one of the purposes of the [Act] was to change the focus of alimony from a form of lifetime pension toward a bridge to self-sufficiency"); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 75, 502 A.2d 1068 (1986) (observing that alimony "is chiefly rehabilitative and is not designed to be a life-time pension" (citation omitted)); 1980 Report of the Governor's Commission on Domestic Relations Laws (hereinafter "Governor's Commission's Report"), at 4 (stating that "the purpose of alimony at the time of divorce is not to provide a lifetime pension").[7]

---

**7.** Prior to the Act, upon divorce, alimony was awarded to a wife (and could not be awarded to a husband) so that she could maintain the standard of living to which she had become accustomed during the marriage. Fault on the part of the wife, such as adultery during the marriage, would extinguish her right to alimony. The underlying assumptions in the law of alimony were that a wife was not capable of supporting herself after divorce and should not be deprived of her station in life because of divorce. These assumptions dovetailed with the limited, fault-based grounds for divorce that existed until the 1970's, when Maryland adopted the no-fault grounds of voluntary separation and separation for a certain period of years, whether voluntary or not. *See Karmand, supra,* 145 Md.App. at 327–28, 802 A.2d 1106 (discussing the history of alimony in Maryland).

Notwithstanding the general rule favoring fixed term alimony, the statutory scheme adopted by the Act recognizes two exceptional circumstances in which a circuit court may award indefinite alimony. *Turrisi, supra,* 308 Md. at 527, 520 A.2d 1080 (observing that "the use of indefinite alimony only in exceptional circumstances" is one of the concepts underlying the Act); *Roginsky v. Blake–Roginsky,* 129 Md.App. 132, 142, 740 A.2d 125 (1999). These exceptional circumstances appear in the Act at Md.Code (2006 Repl.Vol.), section 11–106(c) of the Family Law Article ("FL").

First, the court has discretion to award indefinite alimony if, "due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting[.]" FL § 11–106(c)(1). And second, the court may award indefinite alimony upon a finding that, "even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate." FL § 11–106(c)(2). These exceptions are a "restraint upon the doctrine of rehabilitative alimony" that exist to "protect the spouse who is less financially secure from too harsh a life once single again." *Tracey, supra,* 328 Md. at 392, 614 A.2d 590.

In this case, only the latter, "unconscionable disparity," exception is at issue.[8] Whether the respective standards of living of the parties post-divorce will be unconscionably disparate is a question of fact. *Solomon v. Solomon,* 383 Md. 176, 196, 857 A.2d 1109 (2004). It is a second-level fact, however, that necessarily rests upon the court's first-level factual findings on the factors, listed in FL section 11–106(b), that (so long as they are applicable) are relevant to all alimony

---

8. The trial judge found that the exception in FL section 11–106(c)(1) had no application to this case; indeed, there was no evidence to support any finding that Christina could not reasonably be expected to make substantial progress toward becoming self-supporting due to her age or any illness, infirmity, or disability.

determinations, and "all the factors," including those not listed, "necessary for a fair and equitable award"; and upon how much weight the court chooses to give to its various first-level factual findings.

Whether there will be a post-divorce unconscionable disparity in the parties' standards of living usually begins with an examination of their respective earning capacities. In so doing, the court must " 'project[ ] forward in time to the point when the requesting spouse will have made maximum financial progress, and compar[e] the relative standards of living of the parties at that future time.' " *Simonds, supra,* 165 Md.App. at 607, 886 A.2d 158 (quoting *Francz v. Francz,* 157 Md.App. 676, 692, 853 A.2d 839 (2004)); *Roginsky, supra,* 129 Md.App. at 146, 740 A.2d 125 (approved by *Solomon, supra,* 383 Md. at 195–96, 857 A.2d 1109).

In *Karmand, supra,* this Court affirmed a circuit court's decision to deny indefinite alimony to a requesting spouse. In so doing, we explained that "[a] mere *difference* in earnings of spouses, even if it is substantial, and even if earnings are the primary means of assessing the parties' post-divorce living standards, does not automatically establish an 'unconscionable disparity' in standards of living." *Karmand, supra,* 145 Md.App. at 336, 802 A.2d 1106. Rather, "[t]o constitute a 'disparity,' the standards of living must be fundamentally and entirely dissimilar." *Id.* In addition, as the statute states, the disparity must be "unconscionable." *Id. See also Simonds, supra,* 165 Md.App. at 606, 886 A.2d 158 (quoting *Karmand, supra* ).

The "unconscionable disparity" standard for indefinite alimony was recommended and emphasized in the Governor's Commission's Report, and was adopted by the General Assembly. The Report explained that it was proposing that the court be

empower[ed] . . . in cases where the standard of living of the recipient party would be *unconscionably* disparate from that of the paying party, to provide for an extended or indefinite period of payment. This allows the matter of

relative standards of living to be resolved, as it seems to us it must be, on a case-by-case basis."

Report, at 4 (emphasis in original). "Whether the post-divorce standards of living of former spouses are unconscionably disparate only can be determined by a fact-intensive case-by-case analysis." *Karmand, supra,* 145 Md.App. at 338, 802 A.2d 1106. *See also Tracey, supra,* 328 Md. at 393, 614 A.2d 590 (observing that alimony awards "are founded on notions of equity" and "equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests").

■ To be unconscionable, the disparity in the post-divorce standards of living of the parties must work a "gross inequity," *see Brewer v. Brewer,* 156 Md.App. 77, 100–101, 846 A.2d 1 (2004), and *Roginsky, supra,* 129 Md.App. at 141, 740 A.2d 125, or create a situation in which one spouse's standard of living is "so inferior, qualitatively or quantitatively, to the standard of living of the other as to be morally unacceptable and shocking to the court." *Karmand, supra,* 145 Md.App. at 337, 802 A.2d 1106.

### E. Analysis

■ The indefinite alimony award in this case must be vacated because the trial judge seems not to have exercised any discretion in deciding whether to award indefinite alimony. As mentioned above, the thrust of the closing argument presented on Christina's behalf was that two factors—length of marriage and income percentage differential—alone mandated an award of indefinite alimony. Emphasizing those two factors, Christina's lawyer argued that not awarding indefinite alimony would be "legal error." From the language used by the trial court in its memorandum opinion, it appears to have accepted this argument; specifically, the judge stated that, on the facts before it, indefinite alimony not only was appropriate, it was "required."

■ The trial court was not required to award indefinite alimony (or rehabilitative alimony) in this case. The court had discretion to award no alimony, rehabilitative alimony, or,

upon a proper finding of unconscionable disparity, indefinite alimony. It is legal error for a court, in making a discretionary decision, to fail to exercise discretion. *In re Don Mc,* 344 Md. 194, 201, 686 A.2d 269 (1996); *Maus v. State,* 311 Md. 85, 108, 532 A.2d 1066 (1987). If, as it appears, the court awarded indefinite alimony because, given the length of the parties' marriage and their income percentages, it was required to do so, the court erred, by failing to exercise discretion. *See Woodson v. Saldana,* 165 Md.App. 480, 495, 885 A.2d 907 (2005) (citing *G.E. Capital Mortgage Servs., Inc. v. Edwards,* 144 Md.App. 449, 455, 798 A.2d 1187 (2002)). For that reason, we shall vacate the indefinite alimony award and remand the matter to the trial court for further proceedings.

We shall discuss some of the points raised by Scott for guidance on remand. First, under *Roginsky,* which was approved by the Court of Appeals in *Solomon,* the issue of unconscionable disparity must be determined by projecting into the future, to a time of maximum productivity of the party seeking the award, and not by looking solely to the past. It is not clear from the record whether the trial judge in fact made the necessary projection. The parties stipulated that Scott's vocational expert would testify that Christina, who was working part-time by choice, had the present ability to earn $35,000 per year working full-time. When the trial judge found that Christina "can" earn $35,000 per year, it seems that he was speaking of the present and not projecting into the future; but the word "can" might have been a reference to the future. In any event, on remand the trial court must follow the dictates of *Roginsky.*

Second, it also is clear that, under *Karmand* and *Simonds,* a mere difference in the parties' post-divorce standards of living, even if the disparity is great, does not in and of itself establish a unconscionable disparity. The disparity must be gross, so as to offend the conscience of the court if not ameliorated. Also, unconscionableness *vel non* must be determined based upon the particular facts of the case—both those that must be considered because they are among the factors

listed in FL subsections 11–106(b) and (c), and those that justice requires be considered, in order that equity be done. *See* FL § 11–106(b) (stating that the court shall consider all the factors necessary for a fair and equitable award, including the enumerated factors); *see also, Simonds, supra,* 165 Md. App. at 604–05, 886 A.2d 158 (noting that the enumerated factors in FL § 11–106(b) are "non-exclusive").

Third, the law does not make any of the factors listed in section 11–106(b) determinative or mandate that they be given special weight. The decision whether to award alimony and, if so, for what period of time, is fact-intensive and not subject to a formulaic resolution. This case is an excellent example of why. The parties were married for 23 years. During much of that time, however, they did not function as a married couple, even though they were living together; and, for over a year, they not only were separated but also were engaged in romantic relationships with other people. There are other 23–year marriages in which, by contrast, the parties always functioned as a married couple, and never became involved in other "marriage type relationships." Maryland's Alimony Act is designed so that the court may take into account the differences from marriage to marriage that are not apparent from numbers alone.[9]

Under the Alimony Act, an award of alimony ceases, automatically, upon the remarriage of the recipient. FL § 11–108. The Act does not provide, however, that alimony cannot be awarded, or, if awarded, terminates, or must be terminated, if the recipient lives in a "marriage type relation-

---

**9.** The only Maryland case in which a "raw number" income disparity alone was held to have militated in favor of an indefinite alimony award is *Solomon, supra,* in which the husband earned a guaranteed income of one million dollars a year and the wife had the ability to earn $28,000 a year, at most. After alimony was awarded, the wife would have had $88,000 in income per year, just 8.9% of the husband's yearly income. The Court held that the alimony award did not remove the unconscionable disparity in the parties' post-divorce lifestyles. Obviously, that disparity is far different than the income disparity here.

ship" with another person.[10] However, that circumstance is relevant to the court's consideration of the financial status of the party requesting the award, a factor enumerated in FL section 11–106(b). It also is relevant to whether the post-divorce disparity in the parties' standards of living is or is not unconscionable.[11] So, on remand, the court should consider this fact, and give it whatever weight the court determines it deserves. The fact does not preclude an award of alimony, however.

Because we are vacating the alimony award, there is no reason for us to comment upon the amount of the now-vacated award.

## II.

### *Monetary Award*

 When an alimony award is vacated, any monetary award also must be vacated, as the two are interrelated. *Goshorn v. Goshorn*, 154 Md.App. 194, 212, 838 A.2d 1247 (2003); *see also Melrod v. Melrod*, 83 Md.App. 180, 195, 574 A.2d 1 (1990) ("[Vacating the monetary award] necessitates vacation of the alimony award as well, since any significant change in the monetary award will require the court to reassess its alimony award."). For guidance on remand, we shall address some of the issues raised by Scott with respect to equitable distribution.

### A. *Scott's Loan From His Toyota 401(K) Account*

 Scott argues that the trial court erred by categorizing as marital property the $28,215 that he had yet to repay, of the $40,000 he took from his Toyota 401(k) account to use to

---

**10.** In this case, Christina acknowledged that her relationship with James is a "marriage type relationship." Of course, whether one spouse's relationship with a third party is the functional equivalent of marriage is a question of fact.

**11.** It goes without saying that any involvement of the other spouse in a "marriage type relationship" also would be factually relevant to those issues.

purchase a house with Lisa. Specifically, he maintains that, for that sum to be considered extant marital property, Christina had to show that he dissipated it, and the evidence was insufficient in that regard.

The evidence at trial was sufficient to support a finding that the $25,218 that Scott withdrew from his Toyota 401(k) was extant marital property. Scott himself treated the entire $40,000 withdrawal as a loan against that account, which was an entirely marital account. Accordingly, the trial court properly included the $25,218 in determining the value of the 401(k) account, as it was a debt owed by Scott to that account. The balance due on the loan was a marital asset, regardless of any dissipation analysis.

### B. Distribution By Percentage

Scott maintains that the trial court did not distribute the marital property in accordance with its own ruling. According to Scott, the trial judge determined that a fair distribution of the marital property would have had Scott receiving 60% of it, and Christina receiving the remaining 40%. In fact, the court distributed the marital property so that (according to Scott's calculations), Christina received 44.5% of it.

Scott's calculation of the total value of the marital property in this case, as offered in his brief, is incorrect. He asserts that the value is $575,477. In fact, the correct value is $635,695.[12] Of that amount, $263,591 was jointly titled; $340,383 was titled in Scott's name; and $31,721 was titled in Christina's name.

The trial court divided all of the jointly held marital property by title, i.e., $131,795.50 per party. It directed that 40% of Scott's $232,333 Toyota 401(k) be transferred to Christina, as

---

12. Scott did not include the $28,215 loan balance discussed above in his calculation. He also did not include the $15,000 value to each of the parties' two time shares. Even though the parties had agreed that each would have one time share, the time shares remained marital property until the parties were divorced. Also, Scott failed to include $5,000 jointly held in a Boston Capital account.

is permitted by FL section 8–205(2)(i). That resulted in Scott's owning $139,399.80 of that marital asset, and Christina owning the remaining $92,933.20. Of the remaining marital property, $108,050 was titled in Scott's name and $31,721 was titled in Christina's name. The court also awarded Christina a 40% interest in the marital share of each of Scott's two pensions, to be paid on an "if, as, and when" basis.[13]

Thereafter, the trial judge reviewed the relevant factors in FL section 8–205(b):

1. ... The evidence showed that prior to 1990 [Christina] and [Scott] lived as a "family" and both contributed to the "family" economically and non-economically. After 1990, it can hardly be said that they lived as a family. Neither party looked out for the well being of the other. They seldom ate meals in the home together and each went their separate ways other than an occasional vacation. In addition, there was little or no evidence regarding laundry and house upkeep.

*　　*　　*　　*　　*　　*

3. The economic circumstances of the parties at the time the award is to be made is strong. Each party will receive escrow funds from the sale of their home and once the other marital property titled jointly is divided both parties will have access to sufficient funds.

*　　*　　*　　*　　*　　*

5. This is a lengthy marriage, over 23 years.

*　　*　　*　　*　　*　　*

8. It appears that each party was primarily responsible for their acquisition of the marital property titled in their individual names.

The court then granted Christina a monetary award of $30,531.30, a sum equal to 40% of the $76,329 difference

---

13. Only 80% of Scott's pension acquired during State employment was marital. The marital portion of his Toyota pension is to be calculated using the *Bangs* formula.

between the value of the non-retirement assets titled in Scott's name ($108,050), and the non-retirement assets valued in Christina's name ($31,721). Citing *Caccamise v. Caccamise,* 130 Md.App. 505, 747 A.2d 221 (2000), the court found that Scott's greater contribution to the acquisition of marital property justified a less-than-even division of marital property. The court also took into account that "the parties [had] continued to live a 'marriage of convenience' since 1990, with little or no evidence as to the non-economic contribution of the parties[.]"

Scott is correct that the trial court's distribution and monetary award did not result in his receiving 60% of the marital estate. Because the trial court divided all of the jointly held marital property by title, much of the distribution was on a 50/50 basis, not a 60/40 basis. All told (and not including the survivor benefit we shall discuss below), the approximate ratio of the distributed marital property was 55% to Scott and 45% to Christina.

It is not clear to us, however, that the trial judge intended to distribute the marital property so that a 60/40 division would result. Obviously, he did not accomplish that result, if that was his intention. The only property that was distributed by that ratio was the Toyota 401(k) account, the pensions, and the parties' individually-titled non-retirement assets. Because a substantial portion of the value of the parties' marital property was in their jointly held non-retirement assets, which were divided 50/50, a complete 60/40 division was not achieved.

In its memorandum opinion, the court found that Scott was entitled to a 40% interest ($2,380) in the value of Christina's jewelry ($5,950). Neither the original nor the amended judgment made any reference to this. The court cannot transfer title to property, except as expressly allowed, however. *Pleasant v. Pleasant,* 97 Md.App. 711, 720, 632 A.2d 202 (1993). Because the jewelry remained in Christina's possession, the only vehicle by which the court could have "given" Scott a 40% interest in that property was by a monetary award, which, in this situation, would have been a reduction of

the monetary award Scott was to pay Christina. The court did not do so, however.

## III.

### *Toyota Pension Survivor Benefit*

Scott next contends that the trial court erred in awarding Christina an interest in a survivor benefit for his Toyota pension. Again, this is a monetary issue that must be revisited on remand, because we are vacating the indefinite alimony award. We shall address it briefly, however.

In closing argument, Christina's lawyer made mention of the survivor benefit for Scott's Toyota pension, which Christina was claiming. The following exchange occurred:

THE COURT: What does the survivor benefit cost, and who pays for it?

[Christina's Counsel]: [Scott's counsel] and I discussed that.

THE COURT: And I haven't heard any testimony about that.

[Christina's Counsel]: We discussed that yesterday. We honestly do not know the answer to that. Now, most plans will provide for a reduced annuity to cover the benefit. Once you retire, you will reduce your annuity if you carry the benefit.

If the Court is inclined, what I would propose is, if on that issue alone the Court were inclined to maybe reserve for 90 days and let counsel investigate the cost—

THE COURT: I don't think I am going to do that.

[Counsel for Christina]: Okay.

THE COURT: I think I am going to order it either paid by him or her.

Scott's lawyer argued that there was no evidence adduced about the cost of the Toyota pension survivor benefit, and therefore, any such cost was "purely speculative."

In the trial court's memorandum opinion and order, there was no mention about a survivor benefit for the Toyota pension.

In her motion to alter or amend, Christina asserted that she had sought to recover the Toyota pension survivor benefit; that its existence was proven at trial; that, during discovery, Scott had failed to produce pension documents detailing the cost of the survivor benefit; that the trial court had neither awarded nor denied the survivor benefit; and that the trial court

> requested information regarding the cost to maintain the survivor benefits. That [Christina] has contacted the Toyota Human Resources Department and they advise that there is no cost to the employee to maintain the survivor benefits and that the corporation absorbs all costs associated with the maintenance of the various pension benefits.

At the hearing on the motion to alter or amend, Christina's lawyer argued that, according to a Toyota representative, the cost of the survivor benefit will be incurred upon Scott's retirement, in that, if the court were to award the survivor benefit to Christina, Scott would have to elect a reduced annuity benefit, in order to maintain the survivor benefit. He further argued that Christina would be contributing to the cost of the survivor benefit, because, while Scott is alive and retired, she will receive 40% of a lower benefit amount.

Scott's lawyer responded that Christina had not introduced evidence on this issue at trial, and never complained about a purported discovery violation. Having not complained, she cannot now offer the alleged discovery violation as a reason for failing to meet her burden of proof at trial.

The trial judge ruled from the bench, stating:

> I am going to incorporate all of the factors that I incorporated in my original Opinion and Order regarding issue number four, which was the monetary award. I went over all the factors that I think I was supposed to consider and I came up with the 40 percent.

So, I am going to award a survivor benefit to the wife in the amount of 40 percent, but she is going to pay for the whole thing. She is going to pay for whatever that cost out of her share.

After Christina's lawyer requested clarification of the ruling, the following ensued:

THE COURT: Whatever the cost of the survivor benefit is she pays 40 percent of that.

\* \* \* \* \* \*

[Counsel for Christina]: Thank you. And that 40 percent, Your Honor, will be subject to the same *Bang's* [sic] formula as the retirement?

THE COURT: Absolutely.

In *Potts v. Potts,* 142 Md.App. 448, 468, 790 A.2d 703 (2002), this Court explained that a survivor benefit that is attached to a pension is property separate and apart from the pension itself. A spouse seeking to recover an interest in the survivor benefit attached to the other spouse's pension must request the survivor benefit in addition to any request for the pension benefit itself. That party bears the burden of proving that the survivor benefit is marital property (or a portion of it is marital property), and its value. If the requesting spouse meets his or her burden, the circuit court then has discretion to award the survivor benefit; the benefit is not a matter of right. *Matthews v. Matthews,* 336 Md. 241, 254, 647 A.2d 812 (1994).

In the case at bar, Christina asked the court to award her the survivor benefit for the Toyota pension, but there was virtually no evidence introduced about how to assess the marital portion of the survivor benefit or about its value. There also was no evidence about the details of how the survivor benefit works, and whether the pension plan is designed so that a survivor benefit, or a part of it, can be awarded to an ex-spouse. The rank hearsay offered by Christina, about what the Toyota representative said about the cost of the survivor benefit, was incompetent evidence. The court's award of a part of the survivor benefit did not rest

upon sufficient evidence to show its marital portion, its value, or how it would be distributed. On remand, however, the court may exercise its discretion to take additional evidence on this issue.

## IV.

### *Inconsistent Findings of Fact*

Because the judgment respecting all but divorce is being vacated and the case is being remanded, this issue is moot.

## V.

### *Failure to Modify Alimony & Counsel Fees*

This question also has been rendered moot by our disposition of issue I. We note again, however, as we did *supra*, that, in deciding the issues of alimony and equitable distribution, the trial court must take into account the value of whatever pension survivor benefit, if any, it awards Christina.

## VI.

### *Counsel Fees*

Scott's last contention is that the trial court erred by awarding Christina counsel fees without making a finding that the fees were reasonable. The counsel fee award also must be vacated on account of our vacating the alimony and monetary award judgments. *Malin v. Mininberg*, 153 Md.App. 358, 433–34, 837 A.2d 178 (2003). It may be reconsidered on remand.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY GRANTING INDEFINITE ALIMONY, MONETARY AWARD, AND COUNSEL FEES VACATED. JUDGMENT OF DIVORCE AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**