*K.B. v. D.B.*, No. 2860, Sept. Term 2018 and No. 1155, Sept. Term 2019. Opinion filed on April 29, 2020, by Berger, J.


DIVORCE - ALIMONY - INDEFINITE ALIMONY

Maryland law generally favors fixed-term rather than indefinite alimony, but there are two circumstances under which a circuit court may award indefinite alimony. The first circumstance is when due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting. The second is when even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

INDEFINITE ALIMONY - UNCONSCIONABLE DISPARITY - STANDARD OF REVIEW

A trial court's determination of whether an unconscionable disparity exists is a finding of fact, which the appellate courts review applying the clearly erroneous standard of review. The unconscionable disparity determination is a second-level fact that necessarily rests upon the trial court's first-level factual findings on the statutory factors set forth in Md. Code (1984, 2019 Repl. Vol.), § 11-106(b) of the Family Law Article.

INDEFINITE ALIMONY - UNCONSCIONABLE DISPARITY - LEGAL FRAMEWORK

The unconscionable disparity determination usually begins with an examination of the parties' respective earning capacities. Although mathematical disparity is only the starting point for an unconscionability analysis, the greater the disparity, the more likely it will be found to be unconscionable. An unconscionable disparity exists and indefinite alimony is warranted when the standard of living of one spouse will be so inferior, qualitatively or quantitatively, to the standard of living of the other as to be morally unacceptable and shocking to the court.

INDEFINITE ALIMONY - UNCONSCIONABLE DISPARITY - LENGTH OF MARRIAGE

The length of a marriage is a key factor for the court's consideration when determining whether an unconscionable disparity exists and a long marriage is more likely to result in indefinite alimony. A marriage of almost seventeen years at the time of separation and over nineteen years at the time of trial is a relatively long marriage and the length of the parties' should have been a key factor for the trial court's consideration.

INDEFINITE ALIMONY - UNCONSCIONABLE DISPARITY - PRE-MARRIAGE DISPARITY IN LIVING STANDARDS

A trial court may consider the parties' pre-marriage disparity in living standards when determining whether indefinite alimony is appropriate, but it must be considered in the context of other relevant factors and not given undue weight, particularly when the parties were married for a long period of time.

INDEFINITE ALIMONY - UNCONSCIONABLE DISPARITY DETERMINATION

The trial court erred in finding that there was no unconscionable disparity between the parties' post-divorce standards of living when the wife's imputed income of $35,000 per year was approximately two percent of the husband's income of over one and one-half million dollars per year, the wife was forty-nine years old and had been absent from the workforce for twenty years, and the wife's primary contributions to the household were in the form of childcare and home care.

MARITAL AND NON-MARITAL ASSETS - APPRECIATION - VALUATION - EXPERT TESTIMONY

The trial court did not err by crediting the husband's expert witness's testimony regarding the valuation of the company in which the husband owned a one-third interest. The trial court was entitled to determine, based upon the expert witness's testimony, that the business had not increased in value during the parties' marriage and was, therefore, a non-marital asset.

MARITAL PROPERTY - DISPOSITION OF REAL PROPERTY - TRANSFER OF THE PARTIES' PRINCIPAL RESIDENCE

The trial court did not err in finding that the parties' New Hampshire property was the parties' principal residence and ordering the transfer of the property pursuant to Section 8-205(a)(2)(iii) of the Family Law Article when the parties had moved into the New Hampshire residence with the intent to reside there permanently as a family and it was the last home in which the parties lived together.

MARITAL PROPERTY - DISPOSITION OF REAL PROPERTY - CARRYING COSTS OF PROPERTY PENDING SALE

The trial court did not err in ordering a sale of lieu of partition of the parties' Annapolis home and ordering that the parties be jointly responsible for the carrying expenses of the parties' Annapolis home pending its sale.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2860

September Term, 2018

No. 1155

September Term, 2019

_____

K.B.

v.

D.B.

_____

Berger,
Reed,
Raker, Irma S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed:  April 29, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

* Melanie M. Shaw Geter, J., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1.

This is the second time the parties, K.B. ("Wife") and D.B. ("Husband"), have been before us on appeal from an order of the Circuit Court for Anne Arundel County in their divorce case. In 2018, we addressed the circuit court's order regarding custody of the parties' minor child ("Son") in an unreported opinion. *K.B. v. D.B.*, No. 1769, Sept. Term 2017 (filed June 19, 2018). In the prior appeal, we vacated the trial court's order granting primary physical custody of Son to Husband and remanded the custody matter for further proceedings. This appeal involves economic matters only.

Wife presents four questions for our review, which we have rephrased slightly as follows:

> I. Whether the circuit court erred and/or abused its discretion in connection with its alimony award.
>
> II. Whether the circuit court erred and/or abused its discretion in connection with its determination of marital property and the monetary award.
>
> III. Whether the circuit court erred in connection with its child support order.
>
> IV. Whether the circuit court erred in connection with its counsel fees award.

For the reasons explained herein, we shall affirm the circuit court's judgment of divorce but otherwise vacate the judgment and remand the case for further proceedings consistent with this opinion.

**FACTS AND PROCEEDINGS**

We set forth much of the relevant factual and procedural background in our opinion in the parties' prior appeal:[1]

**I.      History of the Family Prior to the Separation of [Wife] and [Husband] in 2015**

*A. General Information*

> [Wife] was born in Arnold, Maryland in 1968.  [Wife] received a bachelor's degree from Towson University and worked for four years as a flight attendant.  [Wife] pursued a master's degree in teaching at Johns Hopkins University, but she dropped out prior to graduation after the dissolution of her first marriage.
>
> [Husband] was born in 1955 in Exeter, New Hampshire. After graduating from the University of New Hampshire with a business degree in 1980, [Husband] worked for Nike in sales and marketing.  [Husband] moved to Annapolis, Maryland in 1982.  Four years later, [Husband] left Nike and became a salesman for commercial jets.  In 1991, [Husband] and two co-workers formed their own company, which buys, sells, and brokers corporate jets.
>
> [Husband] and [Wife] met in 1996 when [Wife] was working at [Husband]'s business.  [Husband] and [Wife] were married in 1998 in Meredith, New Hampshire.  [Husband] had three children from a prior marriage.  For most of their marriage, the couple lived in Anne Arundel County, Maryland.

*B.  Birth of Son*

> Son was born in 2003.  [Wife] testified that she was the primary caregiver for Son and that she tended to his daily needs, made his meals, bathed him, and put him to bed.  [Wife] testified that she took Son to school and extracurricular activities and picked him up afterward.  [Wife] testified that she was responsible for planning social events, birthday

---

[1] In the prior appeal, we set forth the facts relevant to the custody issue in detail.  In the present appeal, we need not address many of the custody-related facts in detail.

parties, holidays, and family events. [Wife] testified that she made doctor and dentist appointments for Son, attended school functions and parent-teacher conferences, helped Son with homework and school projects, and volunteered in Son's classrooms.

[Husband] testified that [Wife] was frequently unable to care for Son due to health issues. [Husband] testified that [Wife] suffered from severe depression, fibromyalgia, Lyme disease, and bipolar disorder. [Husband] testified that [Wife] would stay in bed for long periods of time. [Husband] testified that these health issues interfered with [Wife]'s ability to parent for "40, 50 percent" of their relationship, leaving [Husband] to take on the role of primary caregiver for Son. [Husband] testified that he sometimes took Son to school, made meals for Son, and took Son shopping. [Husband] testified that he regularly took Son to the pediatrician and dentist during his marriage to [Wife].

[Wife] denies that she has any mental health problems that have affected her parenting. [Wife] testified that she suffered from "situational depression" after discovering her father's dead body, and that she was prescribed an antidepressant around that time, but she no longer takes it. [Wife] also testified that she was prescribed 25 milligrams of Seroquel — an anti-psychotic at much higher dosages — as a sleep aid. In a letter supporting [Wife]'s request to take a support animal on an airplane, [Wife]'s therapist stated that [Wife] suffers from depression. [Wife] testified that [Husband] had obtained a similar letter, and that the purpose of the letters was to facilitate traveling with their pets.

[Husband] testified that his work schedule during the marriage was erratic and that he worked forty to fifty hours a week, including nights and weekends. [Husband] testified that he sometimes had to travel for business, but not more than one day every couple of weeks. [Husband] testified that [Wife] took two or three vacations by herself every year for many years, and that [Husband] took care of Son during these times.

[Husband] testified that he had a good relationship with Son prior to the spring of 2015. [Husband] testified that he and Son would play baseball, ride all-terrain vehicles and dirt bikes together, and do "a lot of that kind of stuff." [Husband] also

3

testified that [Wife] began turning Son against him prior to the dissolution of their marriage. [Husband] testified that as "the disciplinarian," he was "vilified" and became "the common enemy" of Son and [Wife].

*K.B.*, *supra*, Slip Op. at 1-3. In the prior appeal, we summarized the circumstances of the parties' separation as follows:

## II. Separation of [Wife] and [Husband]

In late 2014, the family began living in a house in Alton, New Hampshire that they had purchased the previous year. [Wife] testified that it was essentially a vacation house, whereas [Husband] testified that they had purchased the house with the intention of moving to New Hampshire. [Wife] testified that the family was vacationing at the new house in December of 2014 when [Husband] stated that he did not want to return to Maryland. [Wife] testified that she agreed to remain in New Hampshire for a six-month trial period. [Husband] testified that both [Wife] and Son were "on board" with the move.

[Wife] testified that she and Son were isolated and lonely in New Hampshire. [Wife] testified that the rural milieu made it difficult for Son to make new friends. [Wife] testified that [Husband]'s drinking and drug use escalated in New Hampshire, and that [Husband] would verbally abuse, bully, and intimidate Son and her. [Wife] testified that [Husband] would call Son "a disrespectful little punk" and tell Son that his opinion did not matter. [Wife] testified that [Husband] called her names and "physically intimidated" her in front of Son. [Wife] testified that Son did not like the way [Husband] spoke to her, which led to "many verbal go-arounds" between [Husband] and Son. [Wife] testified that Son would tell [Husband] "that he hated him and that he hated where we lived and he wanted to go home."

[Husband] testified that Son was excited to live in New Hampshire. [Husband] testified that the house was on a lake and five miles from a mountain, giving Son many opportunities to enjoy his favorite outdoor activities. [Husband] testified that Son enjoyed boating and fishing on the lake, and that Son frequently went snowboarding with friends. [Husband]

4

testified that he often observed Son snowboarding with "huge smiles on his face." [Husband] testified that Son adapted to his new school, made friends, and ran track. [Husband] testified that the family joined a local church and Son befriended the pastor's son. [Husband] testified that Son was thriving in a clean, healthy environment, and that "by every account and every conversation I ever had with him, he was happy."

In May of 2015, [Wife] and Son took a 2–day trip to Maryland to attend a party in their old neighborhood. During that trip, [Wife] decided that she and Son would not return to New Hampshire. [Wife] testified that Son asked her "why we were living in a place where we didn't want to be for someone that didn't treat us with kindness." [Wife] testified that "[a]t that point I realized I really had failed my son." [Wife] told [Husband], "I can't live here and [Son] and I are moving back to Maryland." [Husband] testified that he was shocked and asked [Wife] to stay. [Wife] and Son returned to New Hampshire for a short period so that Son could finish the school year before returning to Annapolis. [Husband] testified that he told Son he did not have to leave, to which Son replied, "Dad, you know, mom needs me."

[Husband] testified that his marriage to [Wife] was characterized by a pattern of separation and reconciliation. [Husband] testified that [Wife] had abandoned him and taken Son on three of four occasions prior to this, and that [Wife] had threatened to leave [Husband] many more times.

*K.B.*, *supra*, Slip Op. at 7-8.

Wife filed a Complaint for Absolute Divorce in the Circuit Court for Anne Arundel County on November 6, 2015. Trial was held over twelve days between June and September of 2017. On October 2, 2017, the trial court issued its custody order, which granted primary physical custody of Son to Husband during the school year and primary physical custody of Son to Wife during the summer break. The circuit court held the economic issues *sub curia*. On appeal of the custody order, we vacated the custody

determination and remanded for further proceedings, including the appointment of a best interest attorney for Son and a custody evaluation, in an Opinion issued June 19, 2018. As a result of the remand, a prior *pendente lite* custody arrangement was revived.

On July 13, 2018, the circuit court issued its Memorandum Opinion and Judgment of Absolute Divorce resolving all non-custodial issues. The July 13, 2018 opinion and order did not address child support and referred to Husband having primary physical custody of Son. The trial court awarded Wife rehabilitative alimony in the amount of $12,000.00 per month for thirty months. The trial court also ordered that Husband pay Wife a monetary award of $456,547.28, which was subsequently modified to $446,547.29.

The circuit court further addressed issues relating to the parties' homes in the July 13, 2018 order. The court ordered that the parties' Annapolis home be sold, with the proceeds divided equally between the parties. Between the date of the court's order and the sale of the property, the court ordered that both parties were "jointly responsible for the mortgage and expenses" for the Annapolis property. The court found that the New Hampshire home was the family home and ordered that, within ten days of settlement of the Annapolis home, "the deed to the New Hampshire home is to be transferred to [Husband] via a Quit Claim Deed in exchange for [Husband] paying [Wife] her portion of the equity in the New Hampshire home computed as $202,192.50 . . . minus any monies owed to [Husband] if he is forced to pay more than his joint portion of the mortgage and expenses for the Annapolis property." Wife filed a motion to alter or amend the July 13, 2018 order, which the trial court denied.

6

The trial court set a hearing for October 12, 2018 to address child support pending further custody proceedings. On that date, the parties, as well as the best interest attorney who had been appointed for Son, reached an agreement as to a *pendente lite* custody arrangement. On November 19, 2018, the circuit court issued a child support order, requiring Husband to pay $4,000.00 per month in child support pending a trial on the issue of custody. The trial court entered a *pendente lite* custody and visitation order on November 25, 2018. The court denied Wife's request for *pendente lite* use and possession of the Maryland home. On December 5, 2018, Wife noted an appeal of the July 13, 2018 order, the November 25, 2018 *pendente lite* order, and the trial court's orders addressing multiple motions to alter or amend.

The parties ultimately reached an agreement on custody, pursuant to which Wife was awarded primary physical custody of Son. The agreement was formalized in a consent order filed on January 25, 2019. Following two days of testimony in February and April 2019, the trial court issued a memorandum opinion and order on August 20, 2019 addressing issues of child support and attorney's fees. The court ordered that Husband pay $6,777.00 per month in child support and 90% of Son's private school tuition. The trial court further ordered that Husband pay $15,000.00 toward Wife's attorney's fees. Wife noted an appeal on August 29, 2019.

Wife filed a motion seeking legal fees associated with the prior appeal in the custody case as well as in the present appeal. The trial court denied Wife's motion on October 16, 2019. Wife noted an appeal on October 18, 2019.

7

Additional facts shall be discussed as necessitated by our consideration of the issues on appeal.

**DISCUSSION**

**I.**

The first issue before us on appeal is whether the trial court erred by granting Wife rehabilitative alimony in the amount of $12,000.00 per month for a term of thirty months and denying her request for indefinite alimony. Wife asserts that the trial court erred with respect to both the amount and duration of the alimony award.

*A. The Evidence Below and the Trial Court's Ruling*

In his memorandum opinion, the trial judge explained his decision to grant Wife rehabilitative alimony in the amount of $12,000.00 per month for a period of thirty months. The court explained that it was expressly considering the factors set forth in Md. Code (1984, 2019 Repl. Vol.), § 11-106(b) of the Family Law Article ("FL").[2]

---

[2] FL § 11-106(b) requires the trial court to consider the following when determining a "fair and equitable award":

> (1) the ability of the party seeking alimony to be wholly or partly self-supporting; (2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment; (3) the standard of living that the parties established during their marriage; (4) the duration of the marriage; (5) the contributions, monetary and nonmonetary, of each party to the well-being of the family; (6) the circumstances that contributed to the estrangement of the parties; (7) the age of each party; (8) the physical and mental condition of each party; (9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony; (10) any agreement between the parties; (11) the financial

8

The trial court first considered the ability of Wife to become wholly or partly self-supporting. The parties had stipulated that Wife had the capacity to earn a yearly salary of $35,000.00 within four months by obtaining a position as an administrative assistant. As of the trial court's alimony ruling, Wife was forty-nine years old and had not worked outside of the home since she was thirty. Wife has a bachelor's degree in psychology from Towson University but had never worked in the field of psychology. Wife had taken courses toward a Master's Degree in teaching from Johns Hopkins University, but the trial court observed, "[t]here is some question as to how many of these Master's Degree courses would need to be repeated due to staleness." The trial court found that Wife was "young and in good health" and found there was "simply no reason to justify why [Wife] has not made any effort to support herself or to improve her ability to support herself." The trial court observed that there was "clearly nothing preventing [Wife] from making substantial progress toward becoming self-supporting." The court concluded that "[i]n light of the years where [Wife] was not in the work force, it would be reasonable to

needs and financial resources of each party, including: (i) all income and assets, including property that does not produce income; (ii) any award made under §§ 8-205 and 8-208 of this article; (iii) the nature and amount of the financial obligations of each party; and (iv) the right of each party to receive retirement benefits; and (12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19-301 of the Health-General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

9

conclude that she will need three or four years to develop and fully implement a rehabilitative plan."

With respect to the standard of living established by the parties during their marriage, the trial court characterized the lifestyle as "above average." The trial court emphasized that the parties had met with a financial planner to discuss Husband's anticipated retirement at age sixty-five and "[a] plan was put in place to meet the goals of being debt free by [Husband's sixty-fifth] birthday and having an annuity in place that would provide $25,000.00 per month for the family's living expenses during retirement." The court reasoned that "[w]ith this in mind, it is reasonable to expect both parties to have begun living a more reasonable lifestyle."

With respect of the length of the marriage, the trial judge characterized it as "not a very long one" in that "[t]he parties were married for more than sixteen (16) years from the date of the marriage to the time that [Wife] left New Hampshire, and a little over nineteen (19) years at the time of the hearing." Regarding the contributions of each party to the well-being of the family, the trial court found that Wife "provided the primary non-monetary contributions for the household in terms of childcare and home care" while Husband "provided the monetary contributions for the household."

The trial court discussed at length the circumstances that contributed to the estrangement of the parties. The court observed that both parties had testified that the marriage was "tumultuous" and "both allege[d] mistreatment by the other." The court found that "while both parties contributed to their estrangement, [Wife] bears most of the responsibility." The court emphasized that Wife "abandoned the marriage in May 2015,

10

only six (6) months after moving with the family to New Hampshire" and moved back to Maryland with Son "against [Husband's] wishes." The court further found that "[a]nother issue that greatly contributed to the estrangement of the parties and their inability to reconcile involved efforts by [Wife] to estrange [Husband] from [Son]."

The trial court noted that Wife was forty-nine years old and Husband was sixty-two years old and that both were "in good health and of sound mind." The court, however, had "concerns about [Wife's] mental status in light of what appears to be an unhealthy attachment to [Son], that resulted in the estrangement between [Husband] and [Son]." With respect to the ability of Husband to meet his own needs while meeting the needs of Wife, the trial court found that Husband "ha[d] the financial ability to provide some support to [Wife] while meeting his own needs and the needs of their child." The trial court noted that Wife had sought $25,000.00 per month in indefinite alimony, while Husband had conceded that rehabilitative alimony in the amount of $10,000.00 per month until his retirement at age sixty-five would be appropriate.

When considering any agreement between the parties, the court found that the parties had agreed that neither party would withdraw substantial funds from their joint checking account, which contained approximately $900,000.00, but that Wife had subsequently withdrawn $700,000.00 in July 2015. Wife later returned $250,000.00 to the account. The court also found that the parties had discussed a plan for Husband to retire at age sixty-five in December 2020, which would require a change in the parties' spending habits. The trial court found that this change in spending habits "did not occur."

11

The trial court discussed at some length the parties' financial needs and resources. The trial court found that Husband's "reported 2014 income was $2,239,659.00." Husband's earnings came from his business, which we shall refer to as "Company."[3] The court observed that Husband "admit[ted] a gross income for 2015 of $1,514,270.00 although he has not provided the [c]ourt with his 2015 tax return." The trial court found that Wife was voluntarily impoverished and imputed to her the ability to earn $35,000.00 per year. The court discussed each of the parties' claimed monthly living expenses, including those for Son. Wife claimed monthly living expenses in the amount of $37,166.86, of which $14,457.19 was attributed to Son's expenses. The trial court found that these needs would "now be paid directly by [Husband.]" The trial court apparently did not consider that this Court had vacated the prior custody order granting Father primary physical custody of Son. The court found certain of Wife's claimed expenses "questionable," specifically: $827.15/month for medical and dental expenses above the cost of insurance, $1,428/month for an automobile payment, $250/month for automobile repairs, and $1,118.91/month for household supplies. The court found other claimed expenses not merely questionable, but "exorbitant or frivolous": $528/month for replacement furnishings, $669.46/month for lawn care, $625/month for domestic assistance/housekeeping, $2733/month for vacations, $2000/month for clothing,

---

[3] In order to maintain the parties' and their minor child's privacy, we shall refer to Husband's business as "Company." Company engages in the purchase, sale, and brokering of transactions involving airplanes. Husband owns one-third of Company. Husband testified that due to the nature of Company's business, his income fluctuated depending on the market.

12

$1025/month for banking expenses, $2500/month for religious contributions, and $563.15/month for a hairdresser. The trial court deemed $14,267.67 of Wife's claimed expenses to be excessive. The trial court further discussed Wife's housing expenses, reasoning that Wife would reasonably incur housing expenses "in the neighborhood of $3,000.00 per month" after the Annapolis home was sold.

With respect to Husband's living expenses, the trial court observed that Husband claimed total monthly living expenses of $30,015.00. The court found that Husband's expenses had "necessarily increased as he now has custody of [Son]," but the court failed to acknowledge this Court's ruling vacating the order awarding custody of Son to Husband. The trial court found certain of Husband's claimed expenses to be exorbitant, including "$100.00/month for household repairs, $1500.00/month for dining out over and above $100.00 for food, $1000.00/month in additional recreation and entertainment over and above $1000.00/month for vacations, and $200.00/month for massage." The court found that both parties had engaged in "lavish expenditures over the years" but explained that "[u]nnecessary and lavish expenditures will not establish need for either party, especially since the parties had contemplated reducing expenses as retirement for [Husband] approached." The trial court found that "with [Husband's] retirement approaching, each part[y's] standard of living must be adjusted downward" but concluded that "the evidence establishes that [Husband] has the ability to provide some level of rehabilitative support to" Wife.

After addressing each of the statutory factors, the trial court considered the standard for awarding indefinite alimony set forth in FL § 11-106(c), which provides:

13

The court may award alimony for an indefinite period, if the court finds that:

> (1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

> (2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

The court found that there was "clearly nothing preventing [Wife] from making substantial progress toward becoming self-supporting," and therefore turned its attention to whether there was an unconscionable disparity between the parties' standards of living pursuant to FL § 11-106(c)(2). The court found that Husband's 2015 gross income was $1,514,270, but emphasized that the parties had agreed during the marriage that Husband would retire at age sixty-five in December of 2020. The court found that Wife "was last employed on a full-time basis in 1998 as a pharmaceutical sales representative" which had "afforded her the ability to purchase her own apartment in Montgomery County." The trial court emphasized that "the respective standards of living of the parties have been greatly disparate since well before the beginning of the marriage." The trial court further found that the distribution of marital property pursuant to the court's order mitigated any disparity between the parties' post-divorce standard of living. Ultimately, the trial court found no unconscionable disparity, reasoning as follows:

> Accordingly, after taking into account all relevant factors, including the relatively short length of the marriage (less than 17 years), the monetary award the [c]ourt grants below to [Wife], the monies [Wife] will be receiving as a result of the sale of the Annapolis home, the extent of her non-monetary assets, the receipt of [Husband's] monetary portion of the value

14

of the New Hampshire home, [Wife's] substantially similar living standard before and after the divorce, and [Wife's] uninhibited ability to seek and obtain full-time employment to improve her living standard, the [c]ourt finds that the post-divorce living standard of [Wife] will not be altogether *unconscionably* disparate from the lifestyle she was accustomed to prior to their separation.

(Emphasis in original.)

The trial court, therefore, denied Wife's request for indefinite alimony and instead awarded rehabilitative alimony in the amount of $12,000.00 per month for a period of thirty months.

The trial court addressed the unconscionable disparity issue again in its November 19, 2018 order and memorandum opinion ruling on Wife's motion to alter or amend. The trial court declined to amend its alimony award, explaining as follows:

> Finally, there is an obvious disparity between the parties' respective incomes. [Husband] makes around $2 million per year while [Wife] has voluntarily remained unemployed for the past several years. It is true that even if [Wife] finished her master's degree in education and began teaching, she would not receive nearly the same income as that of [Husband's]. However, as this [c]ourt found in its Judgment of Absolute Divorce, it is also true that the parties' respective standards of living have been greatly disparate since well before the beginning of the marriage. The source of [Husband's] high income -- his business, [Company] -- was established and highly lucrative prior to the marriage, and there has been no increase in the value of the business since the parties wed in 1998. In this context, the disparity between the parties' incomes is not unconscionable given that this disparity pre-dated the marriage.

*B. The Parties' Contentions on Appeal*

Wife asserts that the trial court erred by failing to properly consider several of the alimony factors set forth in FL § 11-106(b) and that the trial court's conclusions on several

15

of the factors were unsupported by the record. Wife further contends that the trial court's finding of no unconscionable disparity between the parties was clearly erroneous. Husband responds that the trial court's findings were supported by the evidence and that the trial court's decision to deny Wife's request for indefinite alimony was not an abuse of discretion.

*C. The Law of Alimony*

The purpose of alimony in Maryland is the "rehabilitation of the economically dependent spouse." *St. Cyr v. St. Cyr*, 228 Md. App. 163, 184 (2016) (quoting *Whittington v. Whittington*, 172 Md. App. 317, 335-36 (2007)). Although "the principal function of alimony once had been maintenance of the recipient, dependent spouse's standard of living," this changed with the adoption of the Maryland Alimony Act in 1980. *Whittington*, *supra*, 172 Md. App. at 335. "The statutory scheme generally favors fixed-term or so-called rehabilitative alimony . . . where practicable to ease the transition from the joint married state to their new status as single people living apart and independently." *St. Cyr*, *supra*, 228 Md. App. at 184-85 (quoting *Solomon v. Solomon*, 383 Md. 176, 202 (2004) (quoting *Tracey v. Tracey*, 328 Md. 380, 391 (1992))).

We have explained:

> The preference for fixed-term alimony stems from "the conviction that 'the purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently.'" *Simonds* [*v. Simonds*], 165 Md. App. [591,] 605 [(2005)](quoting *Tracey*, *supra*, 328 Md. at 391, 614 A.2d 590). *See also Turrisi v. Sanzaro*, 308 Md. 515, 524-25, 520 A.2d 1080 (1987) (noting that fixed-term alimony "promote[s] the transitional or

rehabilitative function" of the Act); *Jensen v. Jensen*, 103 Md. App. 678, 693, 654 A.2d 914 (1995) (stating that "one of the purposes of the [Act] was to change the focus of alimony from a form of lifetime pension toward a bridge to self-sufficiency"); *Campolattaro v. Campolattaro*, 66 Md. App. 68, 75, 502 A.2d 1068 (1986) (observing that alimony "is chiefly rehabilitative and is not designed to be a life-time pension" (citation omitted)); 1980 Report of the Governor's Commission on Domestic Relations Laws (hereinafter "Governor's Commission's Report"), at 4 (stating that "the purpose of alimony at the time of divorce is not to provide a lifetime pension").

Notwithstanding the general rule favoring fixed term alimony, the statutory scheme adopted by the Act recognizes two exceptional circumstances in which a circuit court may award indefinite alimony. *Turrisi*, *supra*, 308 Md. at 527, 520 A.2d 1080 (observing that "the use of indefinite alimony only in exceptional circumstances" is one of the concepts underlying the Act); *Roginsky v. Blake-Roginsky*, 129 Md. App. 132, 142, 740 A.2d 125 (1999). These exceptional circumstances appear in the Act at Md. Code (2006 Repl. Vol.), section 11-106(c) of the Family Law Article ("FL").

First, the court has discretion to award indefinite alimony if, "due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting[.]" FL § 11-106(c)(1). And second, the court may award indefinite alimony upon a finding that, "even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate." FL § 11–106(c)(2). These exceptions are a "restraint upon the doctrine of rehabilitative alimony" that exist to "protect the spouse who is less financially secure from too harsh a life once single again." *Tracey*, *supra*, 328 Md. at 392, 614 A.2d 590.

*Whittington*, *supra*, 172 Md. App. at 336-37 (footnote omitted).

17

A trial court's determination of whether an unconscionable disparity exists is a finding of fact, which we review applying the clearly erroneous standard of review. *Solomon*, *supra*, 383 Md. at 196. "It is a second-level fact, however, that necessarily rests upon the court's first-level factual findings on the factors, listed in FL section 11-106(b), that (so long as they are applicable) are relevant to all alimony determinations, and 'all the factors,' including those not listed, 'necessary for a fair and equitable award'; and upon how much weight the court chooses to give to its various first-level factual findings." *Whittington*, *supra*, 172 Md. App. at 337-38. The unconscionable disparity analysis requires a "fact-intensive case-by-case analysis." *Karmand v. Karmand*, 145 Md. App. 317, 338 (2002); *see also Tracey*, *supra*, 328 Md. at 393 (explaining that alimony awards "are founded upon notions of equity" and "equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests"). The determination of "[w]hether there will be a post-divorce unconscionable disparity in the parties' standards of living usually begins with an examination of their respective earning capacities." *Whittington*, *supra*, 172 Md. App. at 338. "In so doing, the court must project forward in time to the point when the requesting spouse will have made maximum financial progress, and compare the relative standards of living of the parties at that future time." *Id.* (quotation and citation omitted).

"Mathematical disparity is only the starting point for an unconscionability analysis." *Goshorn v. Goshorn*, 154 Md. App. 194, 214 (2003). "The greater the disparity, the more likely that it will be found to be unconscionable." *Ware v. Ware*, 131 Md. App. 207, 229 (2000) (quotation and citation omitted). An unconscionable disparity exists and indefinite

18

alimony is warranted when "the standard of living of one spouse will be so inferior, qualitatively or quantitatively, to the standard of living of the other as to be morally unacceptable and shocking to the court." *Karmand*, *supra*, 145 Md. App. at 338. We have further described an unconscionable disparity in living standards as one that works a "gross inequity." *Brewer v. Brewer*, 156 Md. App. 77, 100-01 (2004).

"In cases involving dramatic income disparities after long marriages, this Court has found an abuse of discretion in a trial court's failure to award indefinite alimony." *St. Cyr*, *supra*, 228 Md. App. at 196. "Even in cases where indefinite alimony is granted, a court abuses its discretion if the amount of indefinite alimony does not alleviate the remaining disparity." *Id.*

D. *Analysis*

First, we address the trial court's finding that Wife was "young and in good health" and there was "clearly nothing preventing [Wife] from making substantial progress toward becoming self-supporting" within three to four years. As we discussed in our previous opinion in the parties' custody case, Husband testified at trial that Wife suffered from severe depression, fibromyalgia, Lyme disease, and bipolar disorder. The trial court did not acknowledge Wife's mental health history and the effect it may have on her ability to become self-supporting.

Furthermore, although the trial judge, as fact-finder, was entitled to credit the evidence he found persuasive, it gives us pause that the court seems to have not considered the challenges an individual faces when attempting to become self-supporting after a lengthy absence from the workforce. When the parties married in 1998, Wife was twenty-

19

eight years old and only one credit shy of obtaining a master's degree in teaching from Johns Hopkins University. Wife was also employed as a pharmaceutical representative and had purchased her own home. Upon marriage to Husband, Wife exited the workforce and took on the primary responsibility of caring for the parties' household and child. Although the parties dispute the reasons for Wife's absence from the workforce, Wife's work in the home permitted Husband to put more time and attention into his career. [4] The trial court found that "[u]pon completion of her Master's in teaching, [Wife] will likely be able to secure a position as a teacher" and observed that as of 2017, the salary range for Anne Arundel County teachers with a master's degree was "between 48,680 and $87,119 per year." Based upon the evidence presented at trial, we do not share the trial court's optimism that Wife can definitively and realistically re-enter the workforce after a twenty-year gap in employment and achieve self-sufficiency in three to four years. Furthermore, even if we were to agree that Wife could likely become self-sufficient in three to four years, the trial court awarded rehabilitative alimony for an even shorter period of time.

Regarding the standard of living established during the marriage, the trial court found that the parties had "enjoyed an above average lifestyle." This is, in our view, quite an understatement. As the trial court acknowledged, both parties "engaged in lavish expenditures during the years" and the total value of the parties' marital property exceeded

---

[4] Wife asserted at trial that the parties had agreed that she would not work and that Husband did not want her to work, but Husband asserted that Wife simply did not want to work during the course of their marriage.

5.8 million dollars, including two homes, multiple boats, snowmobiles, automobiles, and motorcycles.

We take further issue with the trial court's characterization of the parties' marriage as "relatively short" and "not a very long one." The parties met in 1996 and were married in 1998. At the time of the trial court's hearing, they had been married for nineteen years. At the time of the parties' separation in May 2015, the parties had been married for approximately sixteen years and ten months. "There has long been a pattern in Maryland cases reflecting the implied statutory directive that a long marriage is more likely to result in indefinite alimony." *Boemio v. Boemio*, 414 Md. 118, 143 (2010). The *Boemio* Court cited marriages ranging in length from fourteen to thirty years as examples of long marriages for which an award of indefinite alimony was appropriate. *Id.* at 143 n.17. The Court further explained:

> To award indefinite alimony in a twenty-year marriage is not at all unusual. There has long been a pattern in Maryland cases reflecting the implied statutory directive that a long marriage is more likely to result in indefinite alimony. Indeed, it is fair to say that length of the marriage is a key factor, outweighing several of the others listed in FL Section 11-106(b), in determining what is unconscionably disparate. Thus, the trial court's use of the twenty-year benchmark from the [American Academy of Matrimonial Lawyers] guidelines for its award of indefinite alimony is not at all inconsistent with Maryland law.

*Boemio*, 414 Md. at 143.[5]

---

[5] The *Boemio* Court set forth the formulas set forth by the American Academy of Matrimonial Lawyers for the calculation of the amount and duration of an alimony award:

> The AAML guidelines consist of two formulas, one to calculate the amount of an alimony award, and the other to

The marriage at issue in the present case was somewhat shorter from the marriage at issue in *Boemio*, but we disagree with the trial court's characterization of the parties' marriage as "not a very long one." The parties were married for sixteen years and ten months prior to their separation in May 2015 and had been married for over nineteen years at the time of trial. This length of time is well within the range of somewhat long to very long marriages cited by the Court of Appeals in *Boemio*. *Id.* at 143 n.17.[6] In our view, the

> establish its duration. *See* Mary K. Kisthardt, *Re-thinking Alimony: The AAML's Considerations for Calculating Alimony, Spousal Support or Maintenance*, 21 J. Am. Acad. Matrimonial Law. 61, app. A (2008). The guidelines also provide "deviation factors" that may signal a necessary adjustment to the recommended amount or duration. *Id.* To compute the amount of alimony, the adjudicator is to take 30% of the payor's gross income and subtract from it 20% of the payee's income. *Id.* at 78. This amount, however, cannot exceed 40% of the combined gross income of the parties when added to the gross income of the payee. *Id.* To determine the duration of the award, the AAML guidelines suggest multiplying the length of the marriage by one of the following factors: for zero to three years, a factor of 0.3; for three to ten years, a factor of 0.5; for ten to twenty years, a factor of 0.75; and for more than twenty years, permanent alimony. *Id.* at app. A.

[6] The *Boemio* Court presented the following string cite setting forth lengths of marriages for which Maryland courts awarded indefinite alimony in the context of the Court's consideration of whether the twenty-year benchmark in the AAML guidelines was inconsistent with Maryland law:

> *See e.g.*, *Tracey v. Tracey*, 328 Md. 380, 382, 614 A.2d 590, 592 (1992) (26 years); *Turner v. Turner*, 147 Md. App. 350, 361, 809 A.2d 18, 24 (2002) (30 years); *Innerbichler v. Innerbichler*, 132 Md. App. 207, 213, 752 A.2d 291, 294 (2000) (14 years); *Digges v. Digges*, 126 Md. App. 361, 363, 730 A.2d 202, 203 (1999) (26 years); *Crabill v. Crabill*, 119 Md. App. 249, 258, 704 A.2d 532, 536 (1998) (18 years);

trial court mischaracterized the length of the parties' marriage. Furthermore, the parties'

relatively long marriage should have been "a key factor" for the trial court's consideration,

"outweighing several of the others listed in FL Section 11-106(b), in determining what is

unconscionably disparate." *Id.* at 143. The trial court, therefore, erred by failing to give

appropriate consideration to the length of the parties' marriage.

We next turn our attention to the trial court's findings regarding the circumstances

that contributed to the estrangement of the parties, and, in particular, the circuit court's

finding that Wife "greatly contributed" to the estrangement of the parties by engaging in

"efforts . . . to estrange [Husband] from" Son. The trial court found that Son "refused to

see his father for lengthy periods of time, despite the existing court orders, and despite

efforts of [Husband]." The trial court further found that "[w]hile [Wife] claims to have

tried to facilitate the visitation with [Husband], the evidence supports the conclusion that

she did not." The trial court found that Son "appear[ed] to have aligned himself with [Wife]

in an unhealthy manner."

---

> *Caldwell v. Caldwell*, 103 Md. App. 452, 455, 653 A.2d 994, 995 (1995) (26 years); *Blaine v. Blaine*, 97 Md.App. 689, 693, 632 A.2d 191, 193 (1993) (18 years); *Broseus v. Broseus*, 82 Md. App. 183, 189–90, 570 A.2d 874, 877–78 (1990) (19 years); *Bricker v. Bricker*, 78 Md. App. 570, 576, 554 A.2d 444, 447 (1989) (25 years); *Zorich v. Zorich*, 63 Md. App. 710, 718, 493 A.2d 1096, 1100 (1985) (30 years); *Kennedy v. Kennedy*, 55 Md. App. 299, 300–01, 462 A.2d 1208, 1210-11 (1983) (22 years).

*Boemio*, *supra*, 414 Md. at 143 n.17.

The trial court's conclusions regarding Wife's responsibility for estranging Husband from Son are inconsistent with this Court's opinion in the custody case, which was issued nearly one month before the issuance of trial court's memorandum opinion that is at issue in this appeal. In our prior opinion, we explained that Father "constantly tried to undermine the reunification process" with Son and "went months without attending [counseling] sessions, even though Son 'was pretty upset that his father just didn't show.'" *K.B.*, *supra*, Slip Op. at 23. We acknowledged that Wife "should have done much more to foster and repair the relationship between [Husband] and Son," but emphasized that the court-appointed reunification counselor's testimony "makes it clear that, by the end of the trial, the only obstacle to reunification was [Husband] himself." *Id.* We further characterized Husband as "a parent who sought to undermine the reunification process at every turn." *Id.* In our prior opinion, we described in detail the evidence in the record that supported our conclusions on these issues. We adopt by reference the content of our prior opinion and shall not repeat the detailed analysis in this case. The evidence in the record fails to support the circuit court's finding that Wife bore all or primary responsibility for estranging Son from Husband. Accordingly, the trial court's attribution to Wife of all or primary responsibility for estranging Son from Husband constitutes clear error.

Furthermore, the trial court overemphasized the significance of the fact that the parties' respective standards of living were disparate pre-marriage. The trial court particularly emphasized this point in its memorandum opinion addressing Wife's motion to alter or amend, explaining that because Husband's business was lucrative and well established prior to the parties' marriage and the value of the business had not increased,

24

"the disparity between the parties incomes is not unconscionable given that this disparity pre-dated the marriage."

The trial court's consideration of the parties' pre-marriage disparity in living standards was based upon the case of *Roginsky v. Blake-Roginsky*, 129 Md. App. 132 (1999). We explained in *Roginsky* that "[t]he standard of living of each party prior to the marriage is a relevant consideration." *Id.* at 148. In *Roginsky*, the parties had been married for a "relatively short duration" of "approximately five years" with the parties living together for only "two years prior to separation." *Id.* at 147. The trial court awarded the wife indefinite alimony, and the husband appealed. In holding that there was insufficient evidence to support an award of indefinite alimony, we emphasized the short duration of the parties' marriage as well as the fact that the wife was only twenty-eight years old at the time of trial and was pursuing higher education. *Id.* at 147-48. Prior to the parties' marriage, the wife was "poor and surviving by operating a small restaurant," while the husband had a doctorate degree in theoretical nuclear physics and was, for during at least some of the relevant time period, employed by the federal government. *Id.* at 143-44. We determined that the disparity between the parties' pre-marriage standards of living was "a relevant consideration," but emphasized that "all factors relevant to whether unconscionable disparity exists must be considered." *Id.* at 148.

In this case, unlike *Roginsky*, the parties were married for nearly two decades and had resided together for almost seventeen years prior to separating. The parties' pre-marriage standard of living is an appropriate factor for a trial court to consider when determining the amount and duration of alimony, but it must be considered in the context

25

of all other relevant factors and not given undue weight. Under the circumstances of this case, the trial court gave undue weight to the pre-marriage disparity in standards of living between Husband and Wife in light of their lengthy marriage, Wife's twenty-year absence from the workforce, and Wife's primary contributions to the household in the form of childcare and home care.

Having considered the trial court's findings with respect to the statutory alimony factors, we next turn our attention to Wife's assertion that trial court erred, as a matter of law, in not granting her indefinite alimony. In our view, the evidence presented at trial established conclusively that even after Wife makes as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate. We are particularly troubled by the disparity between the $35,000 in income imputed to Wife and Husband's annual income of over one and one-half million dollars. Wife's imputed income is approximately two percent of Husband's. Although there is no "hard and fast rule regarding any disparity" in income which would warrant an award of indefinite alimony, we observe that the Court of Appeals has considered the relative percentage of one spouse's income as compared to the other when determining whether an unconscionable disparity existed:

> There are several cases in which Maryland appellate courts found unconscionable disparity based on the relative percentage the dependent spouse's income was of the other spouse's income. *See Tracey*, 328 Md. at 393, 614 A.2d at 597 (28 percent); *Caldwell v. Caldwell*, 103 Md. App. 452, 464, 653 A.2d 994, 999 (1995) (43 percent); *Blaine v. Blaine*, 97 Md. App. 689, 708, 632 A.2d 191, 201 (1993), *aff'd* on other grounds, 336 Md. 49, 646 A.2d 413 (1994) (23 percent); *Rock v. Rock*, 86 Md. App. 598, 613, 587 A.2d 1133, 1140 (1991)

26

(20-30 percent); *Broseus v. Broseus*, 82 Md. App. 183, 186, 570 A.2d 874, 880 (1990) (46 percent); *Bricker v. Bricker*, 78 Md. App. 570, 577, 554 A.2d 444, 447 (1989) (35 percent); *Benkin v. Benkin*, 71 Md. App. 191, 199, 524 A.2d 789, 793 (1987) (16 percent); *Zorich v. Zorich*, 63 Md. App. 710, 717, 493 A.2d 1096, 1099 (1985) (20 percent); *Kennedy v. Kennedy*, 55 Md. App. 299, 307, 462 A.2d 1208, 1214 (1983) (33 percent). Although we do not adopt a standard that unconscionable disparity exists based on a particular percentage comparison of gross or net income, the relative percentages in these cases offer some guidance [] here in assessing whether the amount of the indefinite alimony award alleviated adequately the unconscionably disparate situation found to exist in the present case.

*Solomon*, *supra*, 383 Md. at 198. The disparity between Husband's income and Wife's imputed income in this case is far greater than that referenced in any of the above-cited cases.

The trial court found that any disparity between the parties' standards of living was mitigated by the distribution of marital property, which was divided equally between the parties. The monetary award, however, only served to level the playing field between the parties with respect to the distribution of marital property. Given Husband's one-third interest in Company, which was valued at $1,972,000.00 by Husband's expert as of May 31, 2016, the parties' post-marriage assets were far from equal. Furthermore, a significant portion of the assets awarded to Wife consists of illiquid assets, and, based upon the record, we are unable to determine what reasonable monthly return Wife may be able to receive from liquidating her portion of the marital property and investing the proceeds. Even if Wife were able to invest the assets and earn a reasonable yearly return, her investment

27

income, when combined with her $35,000.00 in imputed income would be nowhere near

Husband's annual income from Company of over one and one-half million dollars.[7]

The trial court repeatedly discussed Husband's anticipated retirement at age sixty-five. In our view, this potential future event should have been irrelevant to the trial court's alimony determination. It remains undetermined precisely when Husband will retire and how much income he will receive at that point in time. At the time of trial, however, Husband had not retired and continued to earn a large income.[8] The trial court's consideration of Husband's potential future retirement was speculative and, therefore, Husband's potential future retirement should not have been considered in the alimony determination.[9]

---

[7] We observe that Husband could similarly invest his portion of the marital property and earn significant investment income, in addition to his earnings from Company.

[8] Indeed, both parties had certain expectations about how their lives were going to proceed, and the parties' divorce can reasonably be expected to affect both parties' future planning and decision-making in ways unanticipated during the parties' marriage. The trial court seems to have assumed that the parties' divorce would affect Wife's plans to continue her lifestyle as a housewife, but, at the same time, assumed that Husband's planned retirement date would remain altogether unaffected.

[9] In the event of a change in circumstances, either party may move the court for a modification of alimony. *Long*, *supra*, 129 Md. App. at 585-86. We have explained:

> Although most published cases treat increases in alimony or the extension of rehabilitative alimony to indefinite alimony, *see*, *e.g.*, *Blaine v. Blaine*, 336 Md. 49, 646 A.2d 413 (1994), the court also has equitable discretion to reduce or even terminate alimony.

*Id.* at 586.

For all of these reasons, we conclude that the difference in Husband's and Wife's living standards are very likely to remain unconscionably disparate even when Wife has made as much progress toward becoming self-supporting as can reasonably be expected. Accordingly, we hold that the trial court erred by denying Wife's request for indefinite alimony. We shall remand this case for the determination of the amount of indefinite alimony and the entry of an order granting Wife indefinite alimony.[10] Until the trial court has the opportunity to address these issues on remand, "the rehabilitative alimony award that we vacate as a 'final' judgment shall be given the force and effect of a *pendente lite* award." *Simonds*, *supra*, 165 Md. App. at 613. Accordingly, Husband must continue to pay Wife $12,000 per month, but as a *pendente lite* alimony award, not as rehabilitative alimony for a particular term.

**II.**

In addition to her assertion that the trial court erred by denying her request for indefinite alimony, Wife contends that the trial court erred in its determination of the monetary award, child support, and counsel fees. Our decision to vacate the trial court's alimony award affects the trial court's rulings on those matters as well. "[A] court's determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances." *St. Cyr*, *supra*, 228 Md. App. at 198. "'[W]hen this Court vacates one such award, we often vacate the remaining awards for reevaluation.'" *Id.* (quoting *Turner v. Turner*, 147 Md. App. 350, 401 (2002)).

---

[10] We do not address the specific amount of indefinite alimony that should be awarded on remand.

Because we are remanding this case for a re-evaluation of the alimony award, we will also vacate the interrelated orders regarding the monetary award, child support, and counsel fees. We have previously addressed certain appellate issues relating to interrelated orders in domestic cases in order to promote judicial efficiency and provide guidance on remand, *see*, *e.g.*, *Whittington*, *supra* 172 Md. App. at 342, and we exercise our discretion to address certain issues in this case as well.

### A. Monetary Award and Distribution of Marital Property

Wife raises several issues with the trial court's monetary award and distribution of marital property. Specifically, Wife asserts that the trial court (1) improperly determined that Husband's one-third interest in Company was non-marital property; (2) failed to consider "[Company] cash" in the monetary award analysis; (3) failed to include 2015 and 2016 income tax refunds as marital property; (4) improperly ordered that the jointly titled New Hampshire property be transferred to Husband upon his payment to Wife of one-half the agreed-upon net value at the time of trial; (5) improperly ordered that the parties divide the mortgage payments and related payments on the parties' Maryland home; and (6) improperly granted Husband's motion to alter or amend without a hearing.

### 1. Husband's Company

Husband is a one-third owner of Company. The trial court determined that Husband's interest in Company was non-marital because it was acquired before the marriage and the value of the business did not increase during the parties' marriage. We review a trial court's determination of whether property is marital or non-marital applying the clearly erroneous standard. *Innerbichler v. Innerbichler*, 132 Md. App. 207, 229 (2000)

30

("Ordinarily, it is a question of fact as to whether all or a portion of an asset is marital or non-marital property. Findings of this type are subject to review under the clearly erroneous standard embodied by Md. Rule 8–131(c); we will not disturb a factual finding unless it is clearly erroneous.").

When an asset that was originally non-marital appreciates during the course of a marriage, a question arises as to whether the appreciation is itself marital or non-marital. "In determining the marital or non-marital character of disputed property that has its origins as non-marital property, the cases distinguish between passive ownership and increases in value resulting from the active efforts of the owner-spouse." *Id.* at 233. Wife bears the burden of proof as to the classification of Husband's share of Company as marital or non-marital. *See Murray v. Murray*, 190 Md. App. 553, 570 (2010) ("Our case law is clear that the burden of proof as to the classification of property as marital or non-marital rests upon the party who asserts a marital interest in the property, and that party must present evidence as to the identity and value of the property.").

In the present case, the trial court considered testimony from valuation experts produced by each party and concluded that Company's value had not increased since 1998. In reaching this conclusion, the trial court credited the testimony of Husband's expert, who testified that the value of Company was higher in 1998 than at the time of trial. Accordingly, the trial court did not include the value of Company in the marital property.

31

On appeal, Wife asserts that Husband's expert's valuation of the business as of 1998 was inaccurate because it was based only upon a single document.[11] We will not second-guess the trial court's decision to accept Husband's valuation expert's methodology. It is the province of the fact-finder to determine which expert testimony, if any, to accept, and which expert testimony to reject. *Quinn v. Quinn*, 83 Md. App. 460, 470 (1990); *see also Strauss v. Strauss*, 101 Md. App. 490, 509 (1994) ("The strength of [one expert's] method relative to the accuracy of the analysis performed by [the other party's] expert is immaterial to our standard of review."). Accordingly, we will not disturb the trial court's conclusion that Husband's ownership interest in Company was non-marital.

## 2. Company Cash

Wife further asserts that the trial court erred by failing to include "[Company] cash" -- funds Husband left in the business to help satisfy the company's capital requirements -- as a marital asset. Husband concedes that the trial court erred by failing to include "[Company] cash" as a marital asset, but the parties disagree as to the amount of "[Company] cash" that should have been included. On remand, the trial court shall determine the value of "[Company] cash" in the marital property for purposes of determining the monetary award.

---

[11] Wife's valuation expert did not testify as to the value of Company in 1998. Wife asserts that information relevant to valuation was sought during discovery but was not produced by Husband or Company, which hindered her expert's ability to determine the value of Company as of 1998. Wife emphasizes Husband's alleged failure to produce certain critical documents during discovery, but there are no discovery issues before us in this appeal.

32

### 3.  Income Tax Refunds

Wife next contends that the trial court erred by failing to include the value of Husband's 2015 and 2016 tax refunds.  With respect to the 2015 refund, the trial court explained:

> The parties filed separate 2015 tax returns and [Husband] received a refund.  [Husband] testified that he deposited said monies into his account which were then used to support both parties during the separation.  Considering the financial statements submitted by both parties, the [c]ourt finds this claim credible, and DENIES [Wife's] request for a marital share of the 2015 tax refund beyond what is accounted for in the Marital Property tables listed *supra*.

We perceive no error in the circuit court's ruling regarding the 2015 refund.  The circuit court was entitled to credit Husband's testimony that any funds received were deposited into an account.  The balances of the parties' accounts were otherwise included as marital property.  We, therefore, reject Wife's assertion that the trial court erred by failing to appropriately consider Husband's 2015 refund.

With respect to the 2016 refund, the trial court credited Husband's testimony that the 2016 tax return had not been filed at the date of trial, and, therefore, no refund existed at the date of trial.  The trial court found that any potential refund Husband would receive for 2016 was "only speculation on [Wife's] part."  We agree with the trial court that there was no basis to determine the value on an anticipated 2016 refund given that it had not been received and Wife did not present any evidence that would demonstrate the value of

an anticipated refund. We, therefore, reject Wife's assertion that the trial court erred by failing to appropriately consider the 2016 refunds.[12]

### 4. The New Hampshire Residence

Wife's next contention is that the trial court erred by ordering that the parties' jointly titled New Hampshire property be transferred to Husband upon his payment to her of one-half the agreed upon net value at the time of trial. Wife asserts that the court lacked the authority to order the transfer of the property because the New Hampshire home was not the parties' principal residence. Pursuant to FL § 8-205(a)(2)(iii), the trial court has authority to "transfer ownership of an interest in . . . real property jointly owned by the parties and used as the principal residence of the parties when they lived together . . . ." The court may do so by

> 1. ordering the transfer of ownership of the real property or any interest of one of the parties in the real property to the other party if the party to whom the real property is transferred obtains the release of the other party from any lien against the real property;
>
> 2. authorizing one party to purchase the interest of the other party in the real property, in accordance with the terms and conditions ordered by the court; or
>
> 3. both.

*Id.*

It is undisputed that the New Hampshire property was the last property in which the parties resided together during December 2014 until May 2015. As Wife points out, the

---

[12] By the time this case is before the circuit court on remand, however, the 2016 tax return would presumably have been filed.

July 2016 *pendente lite* order, which was entered by consent, referred to the parties'

Annapolis home as the "marital home." However, as Husband points out, Wife signed an

affidavit stating that the New Hampshire house was her legal residence. The trial court

determined that the New Hampshire property, the home in which the parties' last resided

together as a family, was the parties' principal residence. In the court's November 19,

2018 order and memorandum opinion ruling on Wife's motion to alter or amend, the court

explained:

> [A]s discussed in the Judgment of Absolute Divorce, when the parties last lived together, it was in the New Hampshire home. The parties moved to New Hampshire with the intent to permanently reside there as a family, and the parties testified to this fact. When the parties moved to New Hampshire, the Annapolis home ceased to be the parties' "principal residence," and New Hampshire gained that title.

In our view, the trial court's finding that the New Hampshire home was the parties'

principal residence was not clearly erroneous. As such, the trial court did not err in ordering

the transfer of the property pursuant to FL § 8-205(a)(2)(iii).[13]

---

[13] Wife's reliance on *Huntley v. Huntley*, 229 Md. App. 484 (2016), is misplaced. Wife argues that the trial court ordered Wife to surrender her interest in the New Hampshire property "despite Husband having never requested such relief in any pleading filed in this case, as required under *Huntley*." In *Huntley*, the wife filed for divorce and requested, *inter alia*, a monetary award, alimony, a portion of the marital share of her husband's retirement benefits, and attorney's fees. *Id.* at 486. The husband "filed an answer in which he denied [the wife's] entitlement and asked the court to deny [the wife] an award of alimony" and sought no "affirmative relief aside from the grant of a divorce." *Id.* At trial, the husband requested a portion of the marital share of the wife's retirement benefits, which he had not previously requested. *Id.* On appeal, we affirmed the trial court's decision to deny husband's request at trial to make an equitable division of the wife's retirement benefits because the husband, by failing to request such relief in his answer or in any counter-complaint, had not put the wife on notice that there would be any issue at trial related to the wife's retirement benefits. *Id.* at 494-96. In this case, unlike *Huntley*, both parties were

## 5. Annapolis Property Expenses

The trial court ordered the appointment of a trustee to sell the parties' Annapolis property and divide the proceeds equally among the parties. The court further ordered that "[d]uring the time between the date of this [c]ourt's order, and the sale of the Annapolis property, the parties are to be jointly responsible for the mortgage and expenses for said property." The court ordered that, in the event that Husband was "forced to pay more than his joint portion of the mortgage and expenses for the Annapolis property" prior to its sale, Husband would deduct "any monies owed to" Wife from the amount Husband would pay her after the sale of the New Hampshire home.[14]

On appeal, Wife asserts that the trial court's order requiring the parties to be jointly responsible for the carrying expenses of the property pending its sale was improper. Wife emphasizes that the trial court's discussion of the parties' New Hampshire and Annapolis homes referred to Husband and Son residing together in the New Hampshire home when, by the time of the trial court's order, the prior custody order granting primary physical custody of Son to Husband had been vacated by this Court.

---

well aware that the disposition of the two jointly titled real properties would be an issue at trial.

[14] Specifically, the court ordered that "within ten (10) days after the settlement of the Annapolis property, the deed to the New Hampshire home is to be transferred to [Husband] via a Quit Claim Deed in exchange for [Husband] paying [Wife] her portion of the equity in the New Hampshire home . . . minus any monies owed to [Husband] if he is forced to pay more than his joint portion of the mortgage and expenses for the Annapolis property."

As we discussed *supra*, it appears that the trial court may have been unaware of our June 19, 2018 opinion when it issued its memorandum opinion on July 13, 2018. The trial court should not have considered Husband's status as primary custodial parent of Son in the context of its determination of the appropriate disposition of the parties' real property given that we had vacated the trial court's previous custody order. The trial court did, however, address the change in custody as a result of our opinion in its November 2018 ruling on Wife's motion to alter or amend.

In the memorandum opinion addressing Wife's motion to alter or amend, the trial court discussed Wife's contention that the trial court had previously erred by ordering the sale of the Annapolis home given our opinion vacating the grant of primary physical custody to Husband and reinstating the prior *pendente lite* custody arrangement. The trial court observed that the only issue before this Court in the prior appeal was custody of the minor child. The trial court explained that it understood our previous opinion to have reinstated the prior *pendente lite* order "only to the extent that it resolved custody" and the trial court "[did] not read the appellate opinion to preclude th[e trial c]ourt from otherwise addressing the outstanding issues, which were litigated before th[e trial c]ourt at the same time that custody was litigated." We agree with the trial court that our prior opinion addressed child custody only and did not preclude the court from making determinations regarding the disposition of the parties' real property.

Pursuant to FL § 8-202(b), the trial court was authorized to determine each party's ownership interest in the Annapolis home and "order a partition or a sale instead of partition and a division of the proceeds." The trial court's order requiring that the Annapolis home

be sold was consistent with FL § 8-202(b). Wife asserts that the trial court was not permitted to require the parties to share the carrying expenses for the Annapolis property without making a finding that the property was the family home pursuant to FL § 8-208, but we are not persuaded. Upon divorce, the parties became tenants in common of the Annapolis home. *See*, *e.g.*, *Bruce v. Dyer*, 309 Md. 421, 428 (1987) ("The granting of an absolute divorce will sever a tenancy by the entireties."). Although Wife is correct that FL § 8-208 expressly provides that the court may order parties to a divorce action to make mortgage payments and pay other costs in connection with the parties' family home, it does not follow that a court is prohibited to do so for other jointly titled property. Indeed, a partition in lieu of sale is authorized for other jointly titled property. Md. Code (1974, 2015 Repl. Vol), § 14-107 of the Real Property Article. The court was further permitted to order the parties to share the carrying expenses of the Annapolis home pending the sale. *See Keys v. Keys*, 93 Md. App. 677, 681 (1992) ("The right of a cotenant to contribution for mortgage and tax payments is well established."). Accordingly, we are not persuaded that the trial court's disposition of the Annapolis property was unauthorized.

### 6. Motions

Wife further contends that the trial court erred by granting Husband's motion to alter or amend the judgment of divorce without a hearing. Wife had also filed a motion to alter or amend, which was denied by the trial court. Wife asserts that the trial court erred by granting Husband's motion and reducing Wife's monetary award without a hearing in violation of Maryland Rule 2-311, which provides that "[w]hen a motion is filed pursuant to Rule 2-532, 2-533, or 2-534, the court shall determine in each case whether a hearing

38

will be held, but it may not grant the motion without a hearing." Husband does not directly address this appellate argument, but Husband characterizes the trial court's November 19, 2018 ruling as the "correct[ion of] a calculation error." Because we are vacating the trial court's ruling and remanding for further proceedings, we shall not specifically address the propriety of the trial court's grant of Husband's motion without a hearing.

## III.

We shall not address Wife's assertion that the trial court erred by issuing a child support order requiring Husband to pay less than the amount of expenses it found reasonable and appropriate and further erred by failing to make the child support award retroactive to the date of June 20, 2018, the date upon which Son returned to reside with Wife. As we discussed *supra*, because the trial court's "determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances," we shall vacate the trial court's child support award due as well as the alimony award. *St. Cyr*, *supra*, 228 Md. App. at 198.

For clarity on remand, we make one further comment regarding child support. Having reviewed the trial court's detailed child support order, we observe that Wife's assertion that the trial court's previous child support award was in part premised upon a computational error appears to be correct.[15] The trial court will have the opportunity to

---

[15] The trial court reviewed Son's expenses in various categories and delineated the specific amount it found to be reasonable for each category. The trial court's total for Son's reasonable expenses, however, did not correspond with the actual total of all of expenses found to be reasonable by the trial court for each category. The costs found to be reasonable in each category totaled $10,175.29, while the total provided by the trial court was $7,540.00.

39

address this computational error on remand. The trial court will further have the opportunity to address retroactivity of the child support award. As we previously explained in the context of the alimony award, the existing child support order will continue to have "the force and effect of a *pendente lite* award" until the trial court completes proceedings required by this opinion. *Simonds*, *supra*, 165 Md. App. at 613.

## IV.

Finally, we shall not address the merits of Wife's assertion that the trial court erred in its award of attorney's fees. Again, we emphasize that the interrelated nature of alimony, child support, monetary awards, and counsel fee awards. *St. Cyr*, *supra*, 228 Md. App. at 198. When determining an appropriate counsel fees award, the trial court must expressly consider the financial status of each party, as well as the needs of each party, whether there was a substantial justification for bringing, maintaining, or defending the proceeding. FL § 12-103(a). On remand, the trial court will again have the opportunity to address these factors and determine an appropriate fee award.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY GRANTING REHABILITATIVE ALIMONY, MONETARY AWARD, CHILD SUPPORT, AND COUNSEL FEES VACATED. JUDGMENT OF DIVORCE AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2860s18cn.pdf